IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAWRENCE GAINES | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  20-361 |
| | : | |
| RICHARD MARSH, *et al.* | : | |

## MEMORANDUM

KEARNEY, J.                                                                    March 24, 2021

     Stepping outside of a drug house where he served as "muscle" to limit potential customer problems, Lawrence Gaines got into a scuffle with a drug abuser knocking on the door wanting to purchase drugs long after the house closed for the night. A witness swore the scuffle stopped and the prospective drug purchaser later surprised Mr. Gaines by hitting him in the back with a house rail after Mr. Gaines turned away. Mr. Gaines immediately responded by stabbing the prospective purchaser's right arm, right groin, right buttocks, and right thigh in the street. The prospective purchaser bled to death from the stab wounds.

     The Commonwealth charged Mr. Gaines with criminal homicide and first-degree murder. He chose a theory of self-defense. His lawyer suggested Mr. Gaines may not want to testify in his defense. The trial judge twice told Mr. Gaines and his lawyer he could choose not to testify and, if his defense counsel requested, the judge would instruct the jury they could draw "no adverse inference" from his choice not to testify to explain his self-defense theory. He chose not to testify. But for reasons still not explained, the trial lawyer never asked for the "no adverse inference" instruction during the charging conference after the close of the defense case. The trial judge instructed the jury on first- and third-degree murder and manslaughter. But as the trial lawyer did not request the "no adverse inference" instruction, the trial judge did not instruct the

jury they could draw "no adverse inference" from Mr. Gaines's decision not to testify consistent with his constitutional right. When the judge asked counsel following the lengthy charge if they wished to add an instruction, the trial lawyer decided not to ask the judge to give the "no adverse inference" instruction although he then asked for, and obtained, a supplemental reasonable doubt instruction. The trial lawyer did not consult with Mr. Gaines before deciding not to ask for the "no adverse inference" instruction.

The jury chose to convict Mr. Gaines of first-degree murder instead of the lesser homicide offenses also charged. The judge entered a life sentence without possibility of parole based on the first-degree murder conviction consistent with Pennsylvania law. His trial counsel appealed but did not raise the failure to instruct on the "no adverse inference" to be drawn from not testifying. The Pennsylvania Superior and Supreme Courts affirmed the conviction and sentence. The Pennsylvania courts then denied Mr. Gaines's post-conviction challenges brought by new counsel who also never raised the failure to request the "no adverse inference" instruction.

Mr. Gaines now seeks habeas relief claiming insufficient evidence to sustain the first-degree murder conviction and ineffective assistance of both trial counsel and post-conviction counsel. We deny all but one of Mr. Gaines's multiple grounds for habeas relief including his challenge to excluding a possible defense witness. But Mr. Gaines has met his burden in demonstrating ineffective assistance of counsel in failing to request a "no adverse inference" jury instruction without his client's consent after Mr. Gaines twice elected not to testify to support his self-defense theory and post-conviction counsel's failure to argue ineffectiveness based on this decision.

Trial counsel's failure to follow-through on his repeated trial requests for the instruction and then forego the instruction both during the charging conference and after the charge without consulting with Mr. Gaines fundamentally altered the jury's consideration of alternative homicide claims, is constitutionally ineffective, and highly prejudicial in a close case with credible self-defense evidence presented to the jury from an eyewitness. Mr. Gaines's post-conviction counsel admittedly missed the issue and his ineffectiveness on this issue deprived Mr. Gaines of the ability to timely raise this issue in the Post Conviction Relief Act proceedings. We grant Mr. Gaines's petition for habeas relief based only on this ineffectiveness claim and deny and dismiss all other claims. We further find no basis for a certificate of appealability on the denied claims.

## I.     Relevant facts adduced from the state court record.[1]

Lawrence Gaines abused crack cocaine in a known drug house on Ferry Street in the City of Easton, Northampton County on a July 2, 2012 summer evening. He served as the crack house "muscle" to resolve problems when customers lost control.[2] Tony Williams also smoked crack cocaine in the house until around 6:00 a.m. on the morning of July 3 when he heard knocking at the back door. Mr. Williams did not immediately answer the door because the owner of the Ferry Street house told Mr. Williams no one else should be admitted to the house. The individual continued knocking at the back door and Mr. Williams eventually went to answer it. Mr. Williams then recognized the person knocking as William Thompson, known as "Poncho."

Mr. Williams saw Poncho waving a twenty-dollar bill and asking to be let inside the Ferry Street house. Mr. Williams refused to let Poncho in, telling him the owner would not allow anyone else inside. Mr. Williams returned to the living room of the house where he and Mr. Gaines began talking.[3] While Mr. Williams and Mr. Gaines sat in the living room, Poncho

continued knocking at the back door which increased to "boom-boom banging on the door." Mr. Williams and Mr. Gaines ignored the banging, but Mr. Gaines grew tired of the noise and became concerned the continued banging would cause a neighbor to call the police. Mr. Gaines went to the back door and began to speak through the door, without opening it, to Poncho.

Mr. Gaines then opened the back door, and he and Poncho continued their conversation at the doorway. Mr. Williams could not hear the substance of the conversation but heard the men's voices getting louder. Mr. Gaines then left the house, closing the door behind him. Poncho did not enter the house.

Mr. Williams heard both Mr. Gaines and Poncho continue an escalating argument outside the Ferry Street house. Mr. Williams went to the back door to investigate, leaving the house by the back door and walking along an alleyway where the two men argued. Mr. Williams testified he saw Mr. Gaines and Poncho continuing to argue, and he attempted to intervene. Mr. Williams testified he saw Mr. Gaines hit Poncho "out of nowhere" with a "vicious" hit.[4] Mr. Williams testified Poncho did not hit Mr. Gaines before being hit.

Mr. Williams saw Poncho fall to the ground and Mr. Gaines on top of Poncho hitting him and kicking him in the back of the head.[5] Mr. Williams testified he pulled Mr. Gaines from Poncho who then got up and walked away down the street. Mr. Williams thought the fight ended but then saw Poncho return "with a big stick."[6] Mr. Williams testified while he and Mr. Gaines faced each other, and with Mr. Gaines's back to Poncho, Poncho "runs with a stick and hits [Mr. Gaines] in the back" and both Poncho and Mr. Gaines fell to the ground.[7] Mr. Williams testified the stick broke in half. Mr. Williams testified the stick "wasn't . . . real sturdy" and "was like a rail, like an old house rail or something."[8] Mr. Williams testified he did not believe Mr. Gaines saw Poncho coming at him with the stick because Mr. Gaines had his back to Poncho. Mr.

Williams testified he saw Poncho over Mr. Gaines's shoulder and "[i]t happened so fast, I can't give [Mr. Gaines] the heads-up move or nothing. That's when [Poncho] hit [Mr. Gaines] with the stick and they both fall and the stick breaks."[9]

Mr. Williams testified he became afraid when he saw Poncho coming at Mr. Gaines with the stick because he "was standing right - - I mean, me and [Mr. Gaines] was talking. We were close to each other talking" and "[I] was afraid I was going to get hit."[10] With half a stick in Poncho's hand and both he and Mr. Gaines on the ground, the two men began scuffling. Mr. Gaines got up from the ground. Mr. Gaines then pulled a knife out of his pocket and said something like, "oh, it's like that? Yeah, it's like that," and began to stab Poncho who remained on the ground.[11] Mr. Williams grabbed Mr. Gaines from Poncho.[12] Poncho got up from the ground and left. Mr. Williams saw a flow of blood running down the back of Poncho's leg. Mr. William and Mr. Gaines fled the scene.

### *Other witnesses to the incident between Mr. Gaines and Poncho.*

In addition to Mr. Williams's eyewitness testimony, Blane Brandon, a corrections officer at the Northampton County Prison, heard a commotion near Ferry Street. Officer Brandon testified he saw three individuals arguing, two of them starting to fight, the "tall one" hit the "other one," with the "third one" trying to pull the "tall one" off the "other one" in what appeared to be an attempt to break up the fight. Officer Brandon saw the "tall one" hit the "short one" a couple of times, and when the "short one" hit the ground, he saw the "tall one" kick the "short one" a couple of times. Officer Brandon testified the incident lasted about five or ten minutes until he yelled down to the men. Officer Brandon testified the men separated, and he went back to the prison to retrieve something he had forgotten. When Officer Brandon returned five or ten minutes later, he saw the shorter man lying in the middle of the street. Officer

Brandon testified the taller man, approximately 6'2" and wearing a black shirt and blue jeans, acted as the aggressor and the shorter man did not appear aggressive and tried to defend himself. Officer Brandon did not see a weapon on either man.

Jason Bailey, a neighbor of the Ferry Street house, testified he looked out his window around 6:00 a.m. and saw a man he knew as Poncho wrestling with another man on the street. Neighbor Bailey testified Poncho appeared to be on the bottom and the other man on top of him. Neighbor Bailey testified: he saw the other man take a knife and stab the back of Poncho's shoulder blade; saw both men get up; heard Poncho say, "you got your shots in, now I'm going to get my shots in"; saw Poncho grab a stick from the ground near the side of a house and go after the other man; and saw Poncho going back up the street holding his leg.

Catherine Malitsis testified she picked her husband up from work at the Northampton County Prison around 6:00 a.m. on July 3, 2012. Mr. Malitsis saw a man walking toward the car as they drove away from the Prison and approached a stop sign on Ferry Street. The man approached the Malitsis' car and asked them to call 911 and then fell to the ground, bleeding profusely from his leg. Mrs. Malitsis called 911, drove around the block, and waited for police to arrive.

### *Police investigate and charge Mr. Gaines with criminal homicide.*

City of Easton Police Department Officer Jamie Luise received a call around 6:15 a.m. on July 3, 2012 to respond to an incident on the 600 block of Ferry Street. Officer Luise arrived at the location approximately one minute after the call and observed a man—later identified as Poncho—face down in the road at the intersection of Ferry Street and South Union Street. Officer Luise saw a large amount of blood on the man and called for emergency medical services and additional police to secure the scene. Officer Luise and his partner attempted to help the man

6

in the street and locate his wounds. The officers removed the man's pants and underwear, finding wounds in his buttocks and upper thigh area. Officers found the man unconscious, with a faint pulse, and unresponsive. Medics arrived, tended to Poncho, and transported him to the hospital, where he died shortly after arrival.

Detective Joe Alonzo assisted the Easton police in the July 4, 2012 arrest of Mr. Gaines. Detective Alonzo testified Mr. Gaines wore jeans and a black t-shirt. Detective Alonzo did not notice injury to Mr. Gaines, and Mr. Gaines did not complain of injury. Detective Alonzo collected Mr. Gaines's clothing and saw what appeared to be blood stains on his clothing, particularly on his jeans and sneakers.

Police Inspector Daniel Reagan interviewed Mr. Gaines while in custody at the police station. Inspector Reagan advised Mr. Gaines of his *Miranda* rights. Mr. Gaines signed a form confirming he received his *Miranda* rights and understood them. Inspector Reagan then told Mr. Gaines about the investigation, including "his [Mr. Gaines's] name came up in this investigation," and asked Mr. Gaines for "his side of the story."

Mr. Gaines admitted knowing Poncho but denied having anything to do with Poncho's death and being at the scene. Inspector Reagan suggested Mr. Gaines may have been acting in self-defense. Inspector Reagan testified self-defense "wasn't [his] thought" but "because [Mr. Gaines] was going to great lengths to distance himself from what the witness information we had, the evidence we had at that point, I didn't expect him to come in and say that."[13] Mr. Gaines denied being at the scene on the morning of July 3, fighting with Poncho, self-defense, or being injured.[14] Inspector Reagan had already completed an affidavit of probable cause for an arrest warrant charging Mr. Gaines with criminal homicide for the alleged killing of Poncho.[15]

On July 11, 2012, Nicole Blair and her family, while living in an apartment near the Ferry Street house, discovered a knife stuck in the wood on the side of a gate to the back yard. Ms. Blair testified the knife had a silver and black handle, and "it had like tools on it." Ms. Blair identified the knife introduced by the Commonwealth at trial as the knife she found on July 11. The Blair family noticed blood on the knife, wrapped it in a tissue, took it inside their apartment thinking it a fishing knife, and did not call police. After learning of the stabbing, Ms. Blair contacted police. Because Ms. Blair and other family members handled the knife, they provided police with DNA samples. DNA testing revealed the knife contained Poncho's DNA.

### Preliminary hearing and appointment of trial counsel.

A magisterial district judge held a preliminary hearing on October 12, 2012 and bound the criminal homicide and first-degree murder charges over to trial. The court appointed attorney Robert Sletvold to represent Mr. Gaines before the hearing.[16] At a conference before the Northampton County Court of Common Pleas, Mr. Gaines moved to replace Attorney Sletvold as his counsel and for a continuance of the trial date. The court denied his motion and Attorney Sletvold continued to represent Mr. Gaines.

Mr. Gaines faced serious charges. Under Pennsylvania law, first-degree murder is defined as an intentional killing.[17] An "intentional killing" is defined as a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing."[18] The Commonwealth must prove the "accused acted with a specific intent to kill."[19] By contrast, third-degree murder "is an unlawful killing with malice but without the specific intent to kill."[20]

Voluntary manslaughter under Pennsylvania law is defined as a "person who kills an individual without lawful justification . . . if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by (1) the individual killed; or (2) another

8

whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed."[21]A person is guilty of involuntary manslaughter under Pennsylvania law "when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person."[22]

The statutorily imposed sentences for each of these offenses varies widely: a person convicted of first-degree murder "shall be sentenced to death or to a term of life imprisonment";[23] a person convicted of third-degree murder "shall be sentenced to a term which shall be fixed by the court at not more than 40 years"[24]; a person convicted of voluntary manslaughter may be sentenced "for a term which shall be fixed by the court at not more than 20 years";[25]and a person convicted of involuntary manslaughter may be sentenced to a term of imprisonment "fixed by the court and shall be not more than . . . two years."[26]

### *Forensic evidence adduced at trial.*

Forensic pathologist Dr. Samuel Land performed an autopsy on Poncho on July 3, 2012. With no objection from Mr. Gaines, Dr. Land testified as an expert in forensic pathology at trial. Dr. Land testified his examination revealed "multiple areas of trauma" in the nature of "scrapes and abrasions to the head and face" and "multiple stab wounds to the right arm, right groin, right buttocks, and right thigh."[27] Dr. Land testified the scrapes and abrasions to the head and face included an abrasion to the forehead, laceration on the right eyelid, abrasions below the left nostril and left eye, and a series of lacerations, rears, and abrasions on the occipital scalp.[28] Dr. Land testified Poncho sustained these wounds at or around the time of his death and could be consistent with a fight or fall.[29]

9

Dr. Land testified his examination revealed five stab wounds: two to the right buttocks approximately five to six inches deep, one to the right posterior thigh approximately three inches deep, and one to the front right bicep approximately two inches deep.[30] Dr. Land testified these wounds were not immediately life-threatening, and the stab wound to the bicep could be considered a possible defensive wound.[31] Dr. Land testified to a fifth stab wound to the right groin.  This stab wound went through the skin, soft tissue, and muscle, completely perforated the femoral artery, and went further into the muscle of the right thigh.[32] Dr. Land testified the femoral artery provides most of the blood for the lower leg, and if the femoral artery is damaged, "blood's going to spurt out until the person dies."[33] Dr. Land testified the stab wound to the right groin caused "massive bleeding, exsanguination, bleeding out, both externally and into the soft tissues of the thigh and into the back [and pelvis]."[34]

Dr. Land opined to a reasonable degree of medical certainty the manner of Poncho's death as homicide and death caused by multiple stab wounds.[35] Dr. Land testified the knife in Mr. Gaines's possession, which DNA testing revealed contained Poncho's DNA, could cause the stab wounds, and even though the knife had a three-inch blade, an individual could still inflict wounds five or six inches deep by applying sufficient force.[36]

### Mr. Gaines's defense at trial and exclusion of Mr. Gaines's proffered witness.

Mr. Gaines presented a self-defense theory in counsel's opening and closing arguments. Mr. Gaines sought to demonstrate the stick Poncho used to hit him justified the use of force, he had no duty to retreat, and he had a right to stand his ground and use deadly force because Poncho used a weapon readily or apparently capable of lethal use under Pennsylvania statute.[37] Attorney Sletvold planned to bring the self-defense theory out through the testimony of Mr. Williams. Mr. Gaines did not testify.

In his opening, Attorney Sletvold argued Mr. Gaines and Poncho had a verbal altercation, Mr. Gaines punched Poncho in the face, the men scuffled, and Mr. Gaines walked away. Attorney Sletvold argued Poncho escalated events by returning with a stick to attack Mr. Gaines, hitting him in the head. Attorney Sletvold argued Mr. Gaines pulled out his knife to defend himself only after being attacked with the stick. Attorney Sletvold's closing argument continued the self-defense theory. Attorney Sletvold argued Poncho ran toward Mr. Gaines with a stick, hitting him with such force the stick broke and knocked both men to the ground, and Mr. Gaines had to make a "life or death decision" and protected himself.

On the morning of the third day of trial, outside the presence of the jury, Attorney Sletvold advised the court he planned on calling Sergeant Timothy Hornbaker of the Northampton County Sheriff's Department as a witness to support his self-defense theory. Attorney Sletvold proffered he "would . . . initially . . . have [Sergeant Hornbaker] describe how many deputies are in the courtroom, what they carry on their utility belts, and what he would do if I picked up a stick and tried to attack somebody in the courtroom. . . .  I think I need to make that factual record to make the argument to the jury in my closing."[38] The Commonwealth objected to the introduction of Sergeant Hornbaker.

The court would not allow Sergeant Hornbaker to testify consistent with Attorney Sletvold's offer of proof, explaining "any attempt to call such a witness would be to essentially intrude on the province of the jury. It would have to be a witness to tell the jury how they should find in the unique case of Mr. Gaines as opposed to any other related cases. That would be wholly inappropriate and I'll not allow it."[39]

Attorney Sletvold responded he "could be offering and trying to qualify Sheriff Hornbaker as an expert in the protection of people and use of force. I'm not asking what he

would do specifically. The questions would be phrased, you would not hit somebody with a stick. The use of hypotheticals is proper with experts. And if the facts should not be hypothetical, we could use the facts as they have been produced by the Commonwealth if we were outside at the time of this crime, you know, and just run through all of the facts that have been established, and then pose the question: Would you let that happen. I think that is appropriate."[40] The Commonwealth objected.

The court again rejected Attorney Sletvold's argument: "[T]he jury has the duty to determine whether Mr. Gaines acted with justification. You can't call someone to tell them how they should rule. You can't call someone to take the stand and say it was self-defense. I would have done the same thing he did. The Commonwealth can't call somebody to the stand and say that was unnecessary. He wasn't defending himself. He was retaliating. The jury has to determine in this case the facts of this case and determine the facts of this case [sic] and apply it to the law whether it was justified or not."[41] When Attorney Sletvold asked, "Did I understand the court to just say they're not going to be allowed to argue this was retaliation?," the court responded: "Not be allowed to call a witness to tell the jury that this was retaliation. You're trying to miss a step between the facts, the law, and the jury. You're trying to use a person you picked arbitrarily, be it Sheriff Hornbaker in the courtroom or a citizen sitting in the gallery, you're trying to take a person and put them between the jury, the facts, and the law. That's not permitted. That is invading the province of the jury. And each individual juror will be doing exactly what you want to do with somebody on the witness stand; that is, trying to judge whether the conduct, based on the facts available, whether the conduct was appropriate and whether it meets a defense of justification."[42]

After the Commonwealth rested its case, and outside the presence of the jury, the trial court clarified with counsel the proffer of Sergeant Hornbaker. The court explained to Attorney Sletvold under Pennsylvania law "expert testimony on the issue of whether the defendant's belief was reasonable with respect to self-defense is not admissible and irrelevant. And further support of my prior ruling regarding whether one of the sheriffs in the courtroom should be able to testify and whether it was objective or reasonable for a member of the audience."[43]

The court asked Attorney Sletvold, "You did indicate previously that you did not believe Mr. Gaines was going to testify in this matter, nor did you intend to present any further evidence. Is that still the position of the defense?" Attorney Sletvold responded, "I believe so, Your Honor. If I just may make the record clear, I would not be eliciting testimony from Sheriff Hornbaker whether he thought Mr. Gaines acted reasonably. Because I believe that would invade the province of the jury. I would be asking questions more along the lines of would he in this environment, the courtroom environment, permit anybody to strike another person with that stick. Not whether it's reasonable, not whether it's legal, not whether it's justified. And I would not be asking him does he think or speculate that what Mr. Gaines did was proper or reasonable. I believe that is for the jury."[44] Attorney Sletvold explained to the court he "think[s] it goes to the objective facts that you can't go around and hit people with sticks and it's appropriate to stop them, whether it was appropriate in this case, whether it ultimately meets part of the definition of the charges they charged him with, I think that's up to the jury. But I would like to argue with the facts of record that certain - - drawing a hypothetical to match these facts I should be given that opportunity."[45]  The court did not change its ruling.

Attorney Sletvold then asked the court if he could confer with Mr. Gaines regarding whether he would testify. The court took a recess and returned, outside the presence of the jury,

asking Attorney Sletvold if he discussed the matter with Mr. Gaines. Attorney Sletvold told the court, "I did. We spoke at length last night and spoke with him just now. I believe that it's his decision not to testify. And so the defense would have no evidence to present and we would rest."[46]  The court conducted a colloquy with Mr. Gaines regarding his decision not to testify.[47] The court brought the jury back into the courtroom and Attorney Sletvold rested the defense.[48] The court adjourned the jury for the day and held a charging conference in the afternoon.

### *The trial court's charging conference and "no adverse inference" instruction.*

The charging conference is at issue on two different grounds. First, the parties addressed whether the stick used by Poncho to hit Mr. Gaines is "a weapon readily or apparently capable of lethal use." Attorney Sletvold stated, "If I could have called the sheriff, I think it would have been readily apparent. And what that stick - - I'm sorry, what that flimsy little piece of wood - - as the Commonwealth would have the jury believe."[49] In its memorandum under Pennsylvania Rule of Appellate Procedure 1925(a), the trial court explained, "Prior to this reference by defense counsel, there were no indications that the defendant sought to have Sergeant Hornbaker testify about whether the stick was a weapon readily or apparently capable of lethal use. As such, the defendant never presented this issue and we did not have to rule on the issue. The defendant's failure to raise this issue constitutes a waiver of the issue on appeal."[50]

The second issue is whether the trial court would provide the "no adverse inference" instruction if Mr. Gaines elected to not testify. The court raised the issue of a "no adverse inference" jury instruction twice before the charging conference.[51] On the morning of the third day of trial during the court's discussion with counsel regarding Attorney Sletvold's intention to call Sergeant Hornbaker, the court explained to Mr. Gaines he has an absolute right not to testify and asked Attorney Sletvold if he will request a cautionary instruction.[52] Attorney Sletvold

responded, "yes." The court then stated, "I'll give that instruction, advising them they cannot draw any adverse inference for you exercising your constitutional right to remain silent. . . ."[53] Later that day, after Attorney Sletvold advised the court Mr. Gaines elected not to testify and the defense would rest its case, the court colloquied Mr. Gaines regarding his decision not to testify including: "And Mr. Sletvold also indicated that he wishes me to instruct the jury that the jury can draw no adverse inference from your decision to remain silent. Do you understand that?"[54]

But Attorney Sletvold did not request the "no adverse inference" instruction at the charging conference.[55] He has not explained this decision. The court then did not give a "no adverse inference" instruction.[56] But the court did charge the jury on first- and third-degree murder and voluntary and involuntary manslaughter consistent with Pennsylvania Law. As such, the judge found sufficient evidence to allow the jury to choose a lesser included homicide offense which also involved the possibility of a significantly reduced sentence.

At the conclusion of the jury charge, the trial judge called counsel to sidebar and asked the District Attorney and Attorney Sletvold, "Do you believe I have set forth the law as it applies in this case?" and "Have I given all the instructions that you requested?" Attorney Sletvold responded, "yes" to each question.[57] The court asked Attorney Sletvold if he "[is] requesting any additional instructions?" Attorney Sletvold requested an instruction "in order to find [Mr. Gaines] guilty, they must find all the elements that be proven beyond a reasonable doubt, and that the Commonwealth has disproved an element of justification beyond a reasonable doubt."[58] The District Attorney agreed and the court instructed the jury consistent with Attorney Sletvold's request.[59] The court again asked Attorney Sletvold, "[a]re you satisfied that I set forth the law as it applies in this case?" Attorney Sletvold replied, "yes."  The court asked Attorney Sletvold, "[a]re you requesting any further instructions?" Attorney Sletvold replied, "no."[60]

***The jury's verdict and sentencing.***

The jury found Mr. Gaines guilty of first-degree murder. On May 9, 2013, the trial court sentenced Mr. Gaines to a mandatory period of life imprisonment without the possibility of parole.

***Mr. Gaines's direct appeal.***

On May 31, 2013, the trial court denied Mr. Gaines's timely post-sentence motions. Mr. Gaines, through Attorney Sletvold, timely appealed to the Pennsylvania Superior Court. Mr. Gaines raised two issues in the Superior Court: (1) "whether the verdict was against the sufficiency of the evidence in that evidence does not support a conclusion that the defendant acted with malice or the specific intent to kill where the defendant had been attacked by a weapon-wielding man and used a knife to defend himself and no evidence would support an inference that he intentionally and deliberately sought to pierce the femoral artery such that the denial of the post-sentence motion in this regard was erroneous?" and (2) "whether the exclusion of a defense witness who would have testified that the implement wielded by the decedent (a railing used as a club) would have warranted forceful intervention because it was 'a weapon readily or apparently capable of lethal use' was erroneous such that the denial of the post-sentence motion in this regard was also erroneous?"[61]

The Pennsylvania Superior Court affirmed the trial court's judgment on September 2, 2014.[62] On the first issue, the Superior Court affirmed on the basis of the trial court's opinion finding the "Commonwealth presented sufficient evidence to convict [Mr. Gaines] of first-degree murder and to show that he did not act in self-defense where evidence showed [Mr. Gaines] was [the] 'initial aggressor by sucker punching [Poncho] and then continuously punching and kicking

him until [Mr.] Williams was able to pull [Mr. Gaines] off' and [Mr. Gaines] repeatedly stabbed [Poncho] while [Poncho] was vulnerable and lying on ground."[63]

On the second issue regarding the exclusion of Sergeant Hornbaker's testimony, the Superior Court affirmed the trial court's finding Mr. Gaines never made an offer of proof on the stick as a weapon readily or apparently capable of lethal force and found the issue waived on appeal.[64]

Mr. Gaines timely petitioned for allowance of appeal. The Pennsylvania Supreme Court denied his petition.[65]

### *Mr. Gaines's Post Conviction Relief Act petition.*

Mr. Gaines then filed a timely pro se petition under Pennsylvania's Post Conviction Relief Act ("PCRA").[66] The Northampton County Court of Common Pleas appointed Alexander J. Karam, Jr. on June 16, 2015 to represent Mr. Gaines in his PCRA petition.[67] Although represented by Attorney Karam, Mr. Gaines filed an amended pro se PCRA petition on August 13, 2015.

On August 24, 2015, Attorney Karam submitted a "no-merit letter" to the PCRA court.[68] Attorney Karam reviewed Mr. Gaines's initial and amended PCRA petitions and concluded the issues raised by Mr. Gaines in his PCRA petitions did not entitle him to relief under the Act. Attorney Karam did not raise an issue regarding Attorney Sletvold's decision to not request the "no adverse inference" instruction. Attorney Karam requested the court enter an order dismissing the petitions without a hearing under Pennsylvania Rule of Criminal Procedure 907 and permitting him to withdraw from the case.[69]

The PCRA court dismissed Mr. Gaines's PCRA petitions without hearing on October 9, 2015.[70] Mr. Gaines timely appealed the denial of post-conviction relief to the Pennsylvania

Superior Court. The Superior Court vacated the PCRA court's October 9, 2015 Order because it could not find "evidence in the record that a motion to withdraw or no-merit letter pursuant to *Turner/Finley* were filed or that [Mr. Gaines] was timely served. Therefore, [Mr. Gaines] was not informed properly of his rights under the PCRA or his ability to respond to counsel's motion to withdraw."[71] The Superior Court remanded "to permit counsel to properly file a no-merit letter and provide [Mr. Gaines] the rights he is afforded under *Turner/Finley* and its progeny."[72]

On remand, the PCRA court appointed new counsel, Matthew J. Deschler, to represent Mr. Gaines.[73] Attorney Deschler filed an amended PCRA petition on November 22, 2016.[74] Mr. Gaines's counseled amended PCRA petition raised four issues: (1) "Was Attorney Sletvold ineffective for failing to object to the Court's false and contradictory instruction?"; (2) "Was Attorney Sletvold ineffective for failing to request that the Court charge the jury that the stick was a lethal weapon?"; (3) "Was Attorney Sletvold ineffective for failing to sufficiently meet with Defendant and advise him that he needed to testify to support his justification defense, imperfect self-defense, and heat [of] passion defense?"; and, (4) "Was Attorney Sletvold ineffective for failing to file a post-sentence motion that included a challenge to the weight of the evidence?"[75] After a hearing, the PCRA denied Mr. Gaines's amended PCRA petition on November 30, 2017.[76]

Mr. Gaines timely appealed the denial of his second PCRA petition to the Pennsylvania Superior Court. Mr. Gaines raised three issues: (1) "Attorney Sletvold was ineffective for failing to request that the Trial Court charge the jury that the stick was a lethal weapon"; (2) "Attorney Sletvold was ineffective for failing to sufficiently meet with Defendant and advise him that he needed to testify to support his justification defense, imperfect self-defense, and heat [of] passion

defense"; and (3) "Attorney Sletvold was ineffective for filing a post-sentence motion that included a challenge to the weight of the evidence."[77]

The Superior Court affirmed the PCRA court's November 30, 2017 Order.[78] As to the first ineffective assistance claim, the Superior Court rejected Mr. Gaines's argument of his trial counsel's ineffectiveness for failing to request the jury be instructed the stick used by Poncho constituted a lethal weapon as a matter of law. The trial court read the standard Pennsylvania jury instruction on self-defense providing, among other things, "a defendant is not obligated to retreat from the place where he or she is attacked if: . . . [t]he person against whom the defendant uses force displays or otherwise uses a firearm or any weapon readily or apparently capable of lethal harm."[79]   The Superior Court rejected Mr. Gaines's claim the trial court should have instructed the jury Poncho attacked Mr. Gaines with a stick constituting a "weapon readily or apparently capable of lethal harm," finding the trial court properly found this is a question of fact for the jury.[80] The Superior Court found trial counsel "recognized [Mr. Gaines] was not entitled to such an instruction and thus, appropriately argued that the jury should find [Poncho] hit [Mr. Gaines] with a lethal weapon and introduced the stick as physical evidence for the jury's examination as to its weight and texture."[81]

The Superior Court found Mr. Gaines's second ineffective assistance claim without merit because Mr. Gaines "failed to demonstrate 'counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf,'" finding the record devoid of evidence suggesting Mr. Gaines's waiver of his right to testify was not knowing, voluntary, and intelligent.[82] A review of the trial court record showed the trial court had a colloquy with Mr. Gaines during which he acknowledged his right to testify, he understood his right, no one forced or threatened him not to

19

testify, he made the decision not to testify of his own free will, he did not have any questions about his decision not to testify, and it is his decision not to testify.[83] The Superior Court found persuasive Attorney Sletvold's testimony at the PCRA hearing: "he had emphasized to [Mr. Gaines] that it was [Mr. Gaines's] decision alone to decide whether to testify on his own behalf"; explained to Mr. Gaines he intended to present a self-defense theory and explained the advantages and disadvantages of Mr. Gaines testifying; conceded he agreed with Mr. Gaines's decision not to testify because he "had strategic concerns about the risks [Mr. Gaines] faced in being subject to cross-examination"; and reasoned Mr. Williams and the Commonwealth's witness already testified and "provided circumstantial evidence to advance [Mr. Gaines's] theory of self-defense."[84] The Superior Court concluded Attorney Sletvold's "proposed strategy was to rely on [Mr.] Williams's testimony to support [Mr. Gaines's] claim of self-defense and to avoid the risk of the prosecution discrediting [Mr. Gaines] on cross-examination if he testified," and, accordingly, could not find "trial counsel interfered with [Mr. Gaines's] right to testify or gave unreasonable advice that prevented him from making a knowing and intelligent decision to testify on his own behalf."[85]

The Superior Court rejected Mr. Gaines's third ineffective assistance claim. After review of the record, the Superior Court found the trial court did not abuse its discretion in denying Mr. Gaines's motion for a new trial "as it found the jury's verdict was amply supported by competent evidence."[86] The Superior Court rejected Mr. Gaines's argument, finding he "essentially asks [the] Court to reweigh the evidence in his favor; however, we may not substitute our judgment for that of the jury as factfinder, which was free to believe all, part, or none of the evidence," and, accordingly, rejected Mr. Gaines's ineffectiveness of trial counsel for failing to raise a meritless challenge to the weight of the evidence.[87]

Mr. Gaines filed a counseled petition for allowance of appeal from the Superior Court's PCRA order which the Pennsylvania Supreme Court denied on March 11, 2019.[88]

### Mr. Gaines's habeas petition.

Mr. Gaines timely filed a pro se petition for habeas corpus under 28 U.S.C. § 2254 and supporting memorandum.[89] Counsel entered an appearance and filed a supplemental memorandum raising additional issues.[90] The Commonwealth seeks denial and dismissal of Mr. Gaines's petition.[91]

Between his pro se and counseled memoranda, Mr. Gaines raises nine issues for our review. We found one issue of fact raised in Mr. Gaines's pro se petition warranting an evidentiary hearing – Attorney Sletvold's decision to not request a "no adverse inference" jury instruction during the trial court's charging conference or after the trial court delivered the jury instructions despite agreement the court would give such an instruction and his discussion and consent from Mr. Gaines following the trial court's May 8, 2013 colloquy as well as PCRA counsel Attorney Deschler's failure to address these potential concerns in state court.

We held an evidentiary hearing on March 15, 2021, where Attorney Sletvold, Attorney Deschler, and Mr. Gaines testified. Attorney Sletvold conceded the trial transcript shows the trial court and the parties contemplated a "no adverse inference" instruction before the charging conference. In fact, the trial court told Mr. Gaines a "no adverse inference" instruction would be given. But Attorney Sletvold did not request the instruction during the charging conference. And absent the request, the trial court did not give the "no adverse inference" instruction.

Attorney Sletvold did not object. Attorney Sletvold testified he made a strategic decision to not object to the failure to include the "no adverse inference" instruction at the close of the charge. He never explained why he did not request the instruction at the charging conference. He

testified "throwing that in at the end," after the trial court finished instructing the jury, would draw undue attention to Mr. Gaines's decision not to testify, particularly where such an instruction would normally have be given earlier in the charge.[92]  But he candidly conceded he would have expected the "no adverse inference" instruction would have been given when the trial court instructs the jury on the burden of proof including the defense does not have to present witnesses or evidence. [93]  But he does not explain why he never asked for the instruction during the charging conference. He made the decision at the close of the jury instructions to not request the "no adverse inference" instruction.[94]

Attorney Sletvold testified he is aware of Pennsylvania case law criminal defendants in this Commonwealth are entitled to a "no adverse-inference" jury instruction and there is no substitute for such an instruction.[95]

Attorney Sletvold testified he did not raise the failure to give the "no adverse inference" instruction in the post-sentence motion or direct appeal. He swore he had no strategic reason because "it just was not objected to as not part of the record. It was not an issue that I frankly even considered."[96]

Mr. Gaines testified Attorney Sletvold did not discuss with him the strategic decision to not request the "no adverse inference" charge, or ask Mr. Gaines to waive his right to such an instruction, and did not speak at all to him (Mr. Gaines) about the jury instructions.[97]

PCRA counsel Attorney Deschler testified he did not notice the omission of the "no adverse inference" instruction in the jury charge and, having failed to notice, did not include it in his PCRA petition. Attorney Deschler testified he had no strategic decision in failing to raise the omission of the instruction in the amended PCRA petition.[98] After our evidentiary hearing, we

allowed the parties to submit post-hearing memoranda on the "no adverse inference" jury instruction issue.[99]

## II.      Analysis

Mr. Gaines raises nine issues for our review falling into two broad categories: (1) sufficiency of the evidence; and (2) ineffective assistance of trial counsel and PCRA counsel. We deny all grounds for habeas relief except Mr. Gaines's pro se claim of ineffective assistance of trial counsel and PCRA counsel for failing to object to the omission of the "no adverse inference" jury instruction and failing to timely raise this issue to the PCRA court.

### A.      Standards for procedural default and ineffective assistance of counsel.

Mr. Gaines's pro se memorandum in support of his habeas petition raises six grounds of ineffective assistance of both his trial counsel and PCRA counsel.[100] Mr. Gaines's counseled supplemental memorandum raises two additional grounds of ineffective assistance of both trial counsel and PCRA counsel.[101] Mr. Gaines's counseled memorandum asserts it is intended "as a supplement to the pro se habeas petition, and not as an amendment or replacement."[102] The Commonwealth contends because the counseled supplemental memorandum does not address the six ineffective assistance grounds raised by Mr. Gaines in his pro se memorandum, those grounds "have been abandoned by counsel."[103] We disagree. Habeas petitions "may be amended or supplemented as provided in the rules of procedure applicable to civil actions."[104] Federal Rules of Civil Procedure 15 and 81(a)(2), and Habeas Corpus Rule 11, "allows pleading amendments with 'leave of court' any time during a proceeding. Before a responsive pleading is served, pleadings may be amended once as a 'matter of course,' *i.e.*, without seeking court leave."[105]  Mr. Gaines filed his pro se and counseled memoranda before the District Attorney filed his response.

Mr. Gaines's counsel did not abandon claims, and we will review all ineffective assistance of counsel claims raised by both Mr. Gaines and his counsel. Before doing so, we review the applicable standards relevant to our analysis.

### 1.     Exhaustion and procedural default under section 2254.

We may not grant a habeas petition to "a person in custody pursuant to the judgment of a State court . . . unless . . . the applicant has exhausted the remedies available in the courts of the State . . . ."[106]   This principle requires "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."[107] "In Pennsylvania, petitioners afford the state courts that opportunity by fairly presenting their claims to the Superior Court, either on direct review or on appeal of a petition under Pennsylvania's [PCRA]."[108] "To fairly present a claim, a petitioner must introduce both the legal theory and its underlying factual support."[109]

Where a petitioner fails to exhaust his claims in state court, the claims are procedurally defaulted, and we may not review them.[110] But we may review procedurally defaulted claims if the petitioner can show (1) "'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation'";[111] or (2) the "'fundamental miscarriage of justice exception' . . . restricted 'to a severely confined category[ ] of cases in which new evidence shows 'it is more likely than not that no reasonably juror would have convicted the petitioner.'"[112]

To establish "cause," the petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."[113] "A factor is external to the defense if it 'cannot fairly be attributed to'" the petitioner.[114] To show "actual prejudice," the petitioner "must show 'not merely that the errors at . . . trial created a *possibility*

of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"[115] To establish a "fundamental miscarriage of justice," petitioner must show actual innocence.[116]

In *Martinez v. Ryan*,[117] the Supreme Court "recognize[d] a narrow exception to the doctrine of procedural default: '[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.'"[118] A claim of ineffectiveness of counsel may be excused under *Martinez* "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."[119] Where a state, like Pennsylvania,[120] requires a prisoner to raise an ineffective assistance of trial counsel claim in a collateral proceeding, the prisoner may establish "cause" for a default of such a claim in two circumstances: (1) "where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial"; and (2) "where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984)."[121]

Under *Martinez*, the "procedural default of [ineffective assistance of counsel] claims will not bar their review by a federal habeas court if three conditions are met: (a) the default was caused by ineffective assistance of post-conviction counsel or the absence of counsel (b) in the initial-review collateral proceeding (i.e., the first collateral proceeding in which the claim could be heard) and (c) the underlying claim of trial counsel ineffectiveness is 'substantial[.]'"[122]

For a claim to be "substantial" it must have "some merit" akin to the standard for issuing a certification of appealability.[123] "To demonstrate that his claim has some merit, a petitioner must 'show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'"[124] The "some merit" standard is less stringent than the "exacting standards" of *Strickland v. Washington*.[125] If we find *Martinez* excuses the procedural default, we may "consider the merits of a claim that otherwise would have been procedurally defaulted."[126]

### 2. Ineffective assistance of counsel claims under *Strickland v. Washington*.

Claims of ineffective assistance of counsel are evaluated under the two-prong test of *Strickland v. Washington*.[127] "To succeed on such a claim, the petitioner must demonstrate (1) that counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) that the petitioner suffered prejudice as a result of the deficiency."[128]

"To establish prejudice the petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"[129] This is a difficult standard for a petitioner to meet: "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question

is not whether counsel's actions were reasonable. The question is whether there is any reasonable

argument that counsel satisfied *Strickland's* deferential standard."[130]

> **B.    Mr. Gaines's pro se petition raising ineffective assistance claims: we grant habeas relief on the failure to object to the omission of a "no adverse inference" jury instruction but deny all other claims as either procedurally defaulted and not excused by *Martinez* or, if exhausted, not meeting the *Strickland* standard.**[131]

Mr. Gaines's pro se memorandum raises six ineffective assistance of trial and PCRA

counsel:

1.  Ineffective assistance of trial counsel for "unreasonable advice" he should not testify at trial causing Mr. Gaines not to testify despite his testimony being necessary to prove self-defense, and "the state court's factual findings are contrary to the record";[132]

2.  Ineffective assistance of trial counsel for failing to request the jury be instructed the stick used by Poncho to hit Mr. Gaines is a lethal weapon;[133]

3.  Ineffective assistance of PCRA counsel for failing to raise in the initial PCRA petition and/or on collateral appeal the ineffectiveness of trial counsel for failing to obtain the complete criminal record of material witness Mr. Williams and/or the Commonwealth violated *Brady v. Maryland* by failing to disclose this evidence;[134]

4.  Ineffective assistance of PCRA counsel for failing to raise in the initial PCRA petition or on the collateral appeal the ineffectiveness of trial counsel for failing to investigate and obtain Mr. Williams's criminal record precluding the ability at trial to (1) effectively impeach Mr. Williams, and (2) request a *crimen falsi* jury instruction;[135]

5.  Ineffective assistance of PCRA counsel for failing to raise in the initial PCRA petition ineffectiveness of trial counsel for failing to request a "no adverse inference" jury instruction;[136]

6.  Ineffective assistance of PCRA counsel for failing to raise in the initial PCRA petition and/or on the collateral appeal ineffectiveness of trial counsel for failing to request a jury instruction on the voluntariness and constitutionality of Mr. Gaines's statement to the police.[137]

For each ineffective assistance of counsel claim, we must determine: whether the claim

is exhausted or procedurally defaulted; if it is procedurally defaulted, whether default is excused

under *Martinez*; and, if exhausted or excused under *Martinez*, whether Mr. Gaines demonstrates counsel's performance is ineffective under the two-pronged *Strickland* test. The Commonwealth argues Mr. Gaines failed to exhaust his ineffective assistance of trial counsel claims (with the exception of trial counsel's failure to request the stick as a lethal weapon jury instruction) and are procedurally defaulted. The Commonwealth argues Mr. Gaines's claims of ineffective assistance of PCRA counsel are not cognizable under section 2254(i). The Commonwealth does not address *Martinez*.

We conclude only one ineffective assistance of counsel claim has merit relating to the failure to request a "no adverse inference" jury instruction. The failure affects all aspects of the jury's verdict and mandates the Commonwealth timely resolve Mr. Gaines's charges once again consistent with his constitutional rights.  We deny all other ineffective assistance of trial counsel and PCRA counsel claims as analyzed below.

> **1.    Pro se claim of ineffectiveness of PCRA counsel relating to the "no adverse inference" jury instruction is excused by *Martinez* and is prejudicial to Mr. Gaines requiring a grant of habeas relief under *Strickland*.**

Mr. Gaines pro se asserts ineffective assistance of PCRA counsel Attorney Deschler for failing to raise in the initial PCRA petition ineffectiveness of trial counsel Attorney Sletvold's failure to request a "no adverse inference" jury instruction. The record shows the trial court, on two occasions before the charging conference, raised the "no adverse inference" jury instruction; Attorney Sletvold requested such an instruction; and the trial court advised Mr. Gaines a "no adverse inference" instruction would be given to the jury upon Attorney Sletvold's representation Mr. Gaines elected not to testify.[138]

It is undisputed Attorney Sletvold did not ask for the instruction at the charging conference or after the instructions to the jury when afforded at least three opportunities to do so. A review of the transcript from the charging conference shows the trial court did not discuss with counsel the no-adverse inference instruction. The transcript of the jury charge shows the trial court did not give such an instruction, and Attorney Sletvold did not request it or otherwise object to its omission.

Attorney Sletvold swore he discussed the "no adverse inference" instruction with the trial court before the charging conference but when the court failed to give the instruction to the jury, he made the strategic decision not to object because "throwing [the 'no adverse inference' instruction] in at the end . . . may have drew undue attention to the fact that Mr. Gaines did not testify and in this case, where we were not disputed that Mr. Gaines did the act but were trying to use the justification defense, I was more concerned frankly that the jury understand that and less concerned about the no adverse inference instruction."[139]

Attorney Deschler testified he did not raise the issue in the PCRA petition because he failed to notice the omission of the "no adverse inference" instruction from the trial transcripts.

### _Martinez_ excuses the procedural default.

To excuse the procedurally defaulted ineffective assistance claim relating to the "no adverse inference" instruction, Mr. Gaines must meet the three requirements of _Cox v. Horn_: (a) ineffective assistance of post-conviction counsel, here Attorney Deschler, caused the default, (b) in the initial-review collateral proceeding, and (c) the underlying claim of trial counsel ineffectiveness is substantial.

To meet the first _Cox_ requirement, Attorney Deschler must have caused the procedural default by failing to raise it in the PCRA petition in state court. Mr. Gaines must show Attorney

Deschler's failure constitutes deficient performance under the first prong of *Strickland*, that is, Attorney Deschler's representation fell below an objective standard of reasonableness.[140]

Attorney Deschler's representation is objectively unreasonable. Attorney Deschler had no strategic reason for failing to raise the "no adverse inference" instruction issue in the PCRA proceeding; he simply did not notice the issue. A reading of the trial transcripts show the trial court and counsel discussed the "no adverse inference" instruction and the trial court told Mr. Gaines, after Attorney Sletvold represented Mr. Gaines would not testify, a "no adverse inference" instruction would be given to the jury. Despite the trial court's and counsel's contemplated instruction, the trial court never gave the instruction. It is objectively unreasonable to omit from the PCRA petition Attorney Sletvold's failure regarding the instruction.

The second *Cox* requirement is met where, as here, Attorney Deschler failed to raise the ineffective assistance of trial counsel claim in the initial PCRA petition. There is no dispute Attorney Deschler failed to do so.

The third *Cox* requirement is satisfied where Mr. Gaines demonstrates the underlying ineffectiveness of Attorney Sletvold is "substantial," meaning it has "some merit." "The question, for *Martinez* purposes, is merely whether 'reasonable jurists could debate'" Mr. Gaines's ineffective assistance of trial counsel claim has merit, "or whether the claim is 'adequate to deserve encouragement to proceed further.'"[141] We are directed by our Court of Appeals to apply the "two-part *Strickland* analysis, but we remain mindful that the 'substantiality' inquiry 'does not require full consideration of the factual or legal bases adduced in support of the claims.'"[142]

As discussed below in our *Strickland* analysis, Mr. Gaines had a constitutional right to a "no adverse inference" instruction when Attorney Sletvold requested it from the trial court.

While a defendant may waive a "no adverse inference" instruction for strategic reasons, the waiver must be explicit. There is no evidence to show Mr. Gaines waived the "no adverse inference" instruction. The evidence is all to the contrary; he twice agreed not to testify knowing his lawyer would request and the trial judge would instruct the jury could not draw an adverse inference from his decision to not testify.

The "substantiality" test under *Martinez* is "relatively light . . . regarding the merits of the [ineffective assistance of trial counsel] claim", and we are directed by our Court of Appeals "a strict prejudice analysis for *Martinez* purposes would be misplaced."[143] As our Court of Appeals in *Preston* noted: "It could be that the need for a showing of prejudice at the *Martinez* stage might rise and fall depending upon the strength of the [ineffective assistance of trial counsel] claim. Here, where counsel's performance in failing to assert the [constitutional challenge] claim seems clearly substandard under the first prong of *Strickland*, we need not concern ourselves with the prejudice prong of *Strickland* in order to satisfy *Martinez* and excuse the procedural default of the [ineffective assistance of trial counsel] claim. Were the substandard performance not so clear, we might require more of a showing of harm before letting the case advance to a full-blown *Strickland* analysis."[144]

Following our Court of Appeal's decision in *Preston*, we conclude Mr. Gaines satisfies *Martinez* and his procedural defaulted claim is excused.

### *Ineffectiveness of counsel under Strickland.*

Having satisfied *Martinez*, we consider the ineffectiveness assistance claim on the merits under *Strickland*. Under the two-prong *Strickland* test, Mr. Gaines must demonstrate (1) Attorney Sletvold's performance deficient in that it fell below an objective standard of reasonableness, and (2) Mr. Gaines suffered prejudice because of the deficient performance.

31

Under Pennsylvania Supreme Court precedent, "as a matter of Pennsylvania constitutional law, as under the United States Constitution, criminal defendants in this Commonwealth are entitled to a 'no adverse-inference' jury instruction, when a timely request is made to the trial court."[145]  Under our Court of Appeals' precedent, failure to give a "no adverse inference" instruction upon request is not structural error *per se*, but subject to a harmless error analysis.[146]

Under Pennsylvania law, a defendant may waive a "no adverse inference" charge for strategic reasons: "a defendant and his or her counsel may determine that defendant's right to remain silent under Article 1, Section 9 is best served by requesting that a 'no-adverse-inference' charge not be given to the jury, in order to avoid drawing attention to defendant's failure to testify."[147] The Pennsylvania Supreme Court in *Lewis* explained: "The 'fundamental' right at stake here is the right not to be 'compelled to give evidence against [oneself]' from which the 'no-adverse-inference' rule derives. Thus, if defendant and his or her, counsel determine that the fundamental right to remain silent is best served by not drawing attention to defendant's silence, the derivative right (i.e., the 'no-adverse-inference' instruction), may be validly waived. In such cases, an explicit waiver by defendant is required."[148]

Upon review of habeas petitions, we are directed to apply the harmless error standard in *Brecht v. Abrahamson*, which holds an error is not harmless if it "had substantial and injurious effect or influence in determining the jury's verdict."[149] As explained by Judge Robreno, "[r]ather than applying the *Brecht* and *Strickland* tests separately, the Third Circuit has used the *Brecht* test to reach a conclusion regarding whether or not there has been ineffective assistance of counsel."[150] On habeas review, "the harmless inquiry under *Brecht* is coextensive with *Strickland*'s prejudice theory."[151]

Moving to *Strickland's* performance prong, the record shows Attorney Sletvold made a request, and the trial court and parties discussed, a "no adverse inference" instruction. But the trial court gave no such instruction despite an intention by both trial counsel and the trial court to do so. Attorney Sletvold did not object at the conclusion of the jury charge. Attorney Sletvold did not follow-up on the trial court's offer to consider further instruction.

Attorney Sletvold testified he made a strategic decision after the trial court instructed the jury without a "no adverse inference" instruction because he did not want to "call attention to" Mr. Gaines's failure to testify by "throwing in" and the end of the charge the "no adverse inference" instruction. Mr. Gaines testified Attorney Sletvold did not discuss this strategic decision with him, and there is no evidence in the record Mr. Gaines waived his "no adverse inference" instruction.

The Commonwealth argues Attorney Sletvold's strategic decision to not object to the omission of the "no adverse inference" instruction is reasonable and, even if unreasonable, the omission of the "no adverse inference" instruction is harmless error and Mr. Gaines failed to meet his burden of showing prejudice.[152] Mr. Gaines argues the "no adverse" inference "was vital to prevent the jury from speculating that [his] silence was an admission that there was no self-defense and/or there was a specific intent to kill."[153] Mr. Gaines argues it "would be impossible for the jury not to notice" he did not testify making Attorney Sletvold's strategic decision—not to call attention to Mr. Gaines's decision not to testify—senseless. Mr. Gaines further argues the evidence in this case did not overwhelmingly establish a specific intent to kill required for first-degree murder.

Mr. Gaines argues the facts suggest Attorney Sletvold's failure to request the "no adverse inference" instruction was an oversight and, if Attorney Sletvold recognized the trial court's

33

omission of the instruction he could have raised it in the post-sentence motion because the issue had been preserved when the trial court discussed the instruction before the charging conference. Attorney Sletvold failed to raise the issue in the post-sentence motion or on direct appeal thus waiving it, making his performance ineffective. Mr. Gaines additionally argues Attorney Sletvold lacked authority to forego the "no adverse inference" instruction because he failed to consult with Mr. Gaines. Mr. Gaines argues the performance of Attorney Sletvold as well as PCRA counsel Attorney Deschler, who concededly did not notice the issue, is not objectively reasonable.

We can find no reason in the record why Attorney Sletvold failed to object to the omission of the "no adverse inference" charge particularly where he represented to the court Mr. Gaines's decision not to testify in his own defense and, given that decision, recognized the "no adverse inference" instruction should be given to the jury.

We cannot fathom how a "no adverse inference" instruction, delivered after the trial court completed its charge would have "called attention to" the obvious fact Mr. Gaines did not testify particularly where Mr. Gaines based his defense on self-defense, justification, and stand your ground theories. And Attorney Sletvold's strategic decision to not object after the trial court read the full instructions to the jury does not explain why Attorney Sletvold did not object earlier during the charging conference to the omission of the "no adverse inference" instruction. Even if Attorney Sletvold had a strategic decision for failing to object after the trial court charged the jury, he did not obtain Mr. Gaines's explicit waiver. Attorney Sletvold chose to ask for another reasonable doubt instruction and the trial judge agreed to so instruct.  His present claim he thought raising the "no adverse inference" instruction promised to his client when he could have

testified would draw attention does not make sense given the trial judge agreed to provide a reasonable doubt instruction after the jury charge.

We conclude Attorney Sletvold's performance fell below an objective standard of reasonableness in failing to object when the trial court did not read the "no adverse inference" jury charge, meeting the first prong of *Strickland*.

Moving to *Strickland's* prejudice prong, "we ask if there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[154] To satisfy prejudice, Mr. Gaines must also show there is a "reasonable probability" but for Attorney Sletvold's error, "the result of the proceeding would have been different."[155] Mr. Gaines argues prejudice because the failure to provide the "no adverse inference" instruction "shifted the burden of proof to the defense, as it negated the presumption of innocence."[156]

The Commonwealth argues there is no prejudice because there is no realistic likelihood the jury would have reached a different result if given the "no adverse inference" instruction because (1) trial court instructed the jury the Commonwealth has the burden of proving guilt beyond a reasonable doubt, Mr. Gaines is presumed innocent, and he has no obligation to present evidence or testimony in his defense; (2) neither the Commonwealth nor the trial court suggested the jury could infer guilt based on Mr. Gaines's decision not to testify; and (3) the overwhelming trial evidence demonstrated Mr. Gaines's guilt beyond a reasonable doubt on first-degree murder. Based on these reasons, the Commonwealth argues harmless error.[157]

Mr. Gaines argues the error is not harmless because it had a substantial injurious effect or influence in determining the jury's verdict. Mr. Gaines did not contest he stabbed the victim. He presented a self-defense theory and no specific intent to kill. Both defenses, he argues, "highlight the jury's awareness of [his] failure to testify", and absent a "no adverse inference" instruction,

the jury "was free to speculate that silence equaled guilt."[158] He argues there is not overwhelming evidence of a specific intent to kill to support a first-degree murder conviction as demonstrated by the jury's questions on the elements of first-degree murder, third-degree murder, and voluntary manslaughter. Mr. Gaines points out because the jury did not have questions on involuntary manslaughter, it focused on the crimes requiring the elements of specific intent or malice and had to speculate to find those elements without a "no adverse inference" instruction. He argues if the jury received the proper instruction, there is a reasonable probability it "may not have filled in, with speculation, the missing elements of first-degree murder" and "it is more likely than not that the properly instructed jury would not have returned a verdict of first-degree murder."[159]

As explained above, we must apply the *Brecht* harmless error test to due process violations or the ineffective assistance of counsel test under *Strickland*. Applying *Brecht*, we find Mr. Gaines is prejudiced by the failure to charge the jury with a "no adverse inference" instruction. Unlike cases finding no prejudice for failure to give a "no adverse inference" instruction based on references to the same protections in other instructions, the record shows no charge given at all. For example, in *Young v. Folino* and *Howard v. Horn*, Judge Robreno affirmed the state courts' finding of no prejudice where the trial court gave a "no adverse inference" instruction in preliminary instructions and where the weight of the evidence would not have made a difference in the jury's verdict.[160] Here, the preliminary instructions did not contain a "no adverse inference" instruction.

We cannot conclude the failure to ever instruct the jury Mr. Gaines has an absolute constitutional right to remain silent such that the jury cannot draw an inference of guilt or other inference adverse to Mr. Gaines from the fact he did not testify is "harmless" in this case. Mr.

36

Gaines's state of mind during the altercation could materially affect the jury's evaluation of the self-defense theory. It could certainly affect the jury's consideration of lesser included offenses with significantly less time incarcerated.  Mr. Gaines's mental state distinguishes his liability under the four different homicide charges.  Self-defense necessarily involves an analysis of Mr. Gaines's state of mind upon being struck by a house rail with his back turned.  We are particularly concerned where, as here, Mr. Gaines's testimony "is vital to the nature of the defense asserted" and his choice not to testify "would heighten the jury's awareness of [his] failure to testify."[161]

We reject the Commonwealth's argument the trial court gave several instructions, which when considered as a whole, essentially constitute the "no adverse inference" instruction. The Pennsylvania Superior Court rejected such an argument: "Following the principles enunciated in *Lewis*, the Commonwealth cannot present a patchwork quilt of comments to the jury and contend that, stitched together, they were sufficient to safeguard the concept embodied within the no-adverse-inference instruction. The case law teaches instead that once the instruction is requested, the trial court must emphatically include it in its charge to the jury. Accordingly, trial counsel's failure to object to the trial court's instruction was error and would satisfy the requirement that Appellant present a claim of arguable merit."[162]

We also do not find the evidence at trial overwhelming on a first-degree murder charge, which requires the Commonwealth to prove specific intent to kill or malice as an element. The evidence showed a fight between Poncho and Mr. Gaines, the fight broke up, Poncho returned with a stick hitting Mr. Gaines from behind, prompting a second fight between the men. With only the testimony of Mr. Williams, the line between first-degree murder and third-degree murder is not overwhelming as argued by the Commonwealth. We recognize *Strickland*'s

prejudice prong is a high hurdle, but we find there is at least a reasonable probability the result of this trial would have been different but for Attorney Sletvold's error (and Attorney Deschler's failure to raise Attorney Sletvold's error). As explained above, a reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. Without the proper instruction—despite clearly intended by Attorney Sletvold and the trial court with no objection from the Commonwealth—there is a probability sufficient to undermine confidence in the outcome of trial. Without the proper instruction, "the jury is left to roam at large with only its untutored instincts to guide it, to draw from the defendant's silence broad inferences of guilt. Even without adverse comment, the members of a jury, unless instructed otherwise, may well draw adverse inferences from a defendant's silence."[163]

The Commonwealth chose not to address the merits of Mr. Gaines's arguments in his pro se petition, instead arguing he abandoned his pro se claims. The Commonwealth alternatively argues even if not abandoned, Mr. Gaines's pro se ineffective assistance of trial claims are unexhausted and procedurally defaulted and his pro se ineffective assistance of PCRA counsel are not cognizable in a habeas petition despite Mr. Gaines's argument *Martinez* excuses default. With no substantive response from the Commonwealth, and for the reasons explained, we grant Mr. Gaines's ineffective assistance of trial and PCRA counsel claims.

### 2. Two pro se ineffective assistance of trial counsel claims are exhausted, but habeas relief is not warranted.

Mr. Gaines exhausted two ineffective assistance of trial counsel claims: (1) ineffective assistance for giving "unreasonable advice" not to testify at trial despite it being necessary to prove his self-defense theory; and (2) ineffective assistance for failing to request a jury instruction the stick used by Poncho to hit Mr. Gaines is a lethal weapon as a matter of law.[164]

Both claims are exhausted. Applying *Strickland*, we conclude Mr. Gaines fails to show deficiency in Attorney Sletvold's performance. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."[165]

In Mr. Gaines's November 22, 2016 amended PCRA petition, Attorney Deschler raised four issues, including two relevant for our analysis: "Was Attorney Sletvold ineffective for failing to request that the Court charge the jury that the stick was a lethal weapon?" and "Was Attorney Sletvold ineffective for failing to sufficiently meet with Defendant and advise him that he needed to testify to support his justification defense, imperfect self-defense, and heat passion defense?"[166]  The PCRA court did not find Attorney Sletvold's assistance ineffective on these grounds.[167]

Mr. Gaines appealed to the Pennsylvania Superior Court raising issues including: (1) "Attorney Sletvold was ineffective for failing to request that the Trial Court charge the jury that the stick was a lethal weapon" and (2) "Attorney Sletvold was ineffective for failing to sufficiently meet with Defendant and advise him that he needed to testify to support his justification defense, imperfect self-defense, and heat passion defense."[168]

Having raised both grounds in the state courts, they are exhausted.[169] We then turn to an analysis of whether the Pennsylvania Superior Court's decision is an unreasonable application of *Strickland v. Washington*. Under the AEDPA, we may not grant a habeas petition on any claim adjudicated on the merits in state court unless the adjudication of the claim: (1) resulted in a decision contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[170]

39

To demonstrate ineffective assistance of his trial counsel, Mr. Gaines must meet the two-pronged *Strickland* test to show his counsel's performance deficient in that it fell below an objective standard of reasonableness, and he suffered prejudice as a result of the deficiency. As explained above, this is a highly deferential standard, even "doubly so" where the AEDPA and *Strickland* work in tandem.

### Ineffective assistance claim: failure to advise Mr. Gaines to testify.

Mr. Gaines argues ineffective assistance by Attorney Sletvold for failing to advise the need to testify on his own behalf to support his self-defense theories. To sustain a claim of ineffective assistance of counsel for failing to advise Mr. Gaines of his right to testify, Mr. Gaines must demonstrate Attorney Sletvold either "interfered with his right to testify, or . . . gave specific advice so unreasonable as to vitiate [Mr. Gaines's] knowing and intelligent decision to testify on his own behalf."[171]

In his habeas brief, Mr. Gaines argues the reason he did not testify on his own behalf "is because the Commonwealth was going to make [me] look like a bad guy. More importantly, they were going to impeach [me] with [my] prior criminal record which consisted of robbery convictions."[172] At the PCRA hearing, Mr. Gaines testified Attorney Sletvold told him he should not testify because: "For one, [Attorney Sletvold] brought up my criminal record. I said, it doesn't matter about my criminal record because everybody in that house had a criminal record, so I wasn't worried about that . . ."[173]

Mr. Gaines argues his earlier convictions "consisted of robbery" which he contends—without authority—is not a crime of dishonesty or false statements and could not have been used by the Commonwealth to impeach him at trial.[174] Mr. Gaines contends Attorney Sletvold provided unreasonable advice by telling him robbery is a *crimen falsi* offense.

40

Under Pennsylvania law, "robbery and burglary are considered *crimen falsi* and convictions for these offenses are admissible for impeachment purposes."[175] The record of the PCRA hearing shows Mr. Gaines had prior convictions not only for robbery but for offenses including retail theft; unsworn falsifications; and false identification, all *crimen falsi* offenses.[176] Any or all of these offenses could have been used by the Commonwealth to impeach Mr. Gaines. Based on review of the record, Mr. Gaines fails to show Attorney Sletvold "gave specific advice so unreasonable as to vitiate [his] knowing and intelligent decision to testify on his own behalf." Mr. Gaines fails to show Attorney Sletvold's performance fell below an objective standard of reasonableness and fails to meet the first prong of the *Strickland* test.

Mr. Gaines alternatively argues the state court's factual findings "are inconsistent with the record" (under section 2254(d)(2)) particularly because "the Commonwealth did not provide the court's [sic] with evidence which demonstrates that [he] had convictions which consist of *crimen falsi* offenses."[177] As detailed above, Mr. Gaines had prior *crimen falsi* convictions. We dismiss Mr. Gaines's argument the state court's factual findings are inconsistent with the record.

### Ineffective assistance for failure to request a jury instruction the stick is a lethal weapon as a matter of law.

Mr. Gaines next argues ineffectiveness of Attorney Sletvold for failing to request the jury be instructed the stick used by Poncho to hit him constitutes a lethal weapon as a matter of law. Mr. Gaines argues Attorney Sletvold should have requested such an instruction because the trial court "forthrightly opined that the stick was a weapon readily or apparently capable of lethal use" and, given the trial court's opinion, Attorney Sletvold's failing to request the charge is constitutionally ineffective assistance of counsel.[178]

A review of the transcript from the charging conference shows the trial court did not "opine" the stick "was a weapon readily or apparently capable of lethal use." Mr. Gaines pulls out of context a passage from the parties' lengthy discussion with the trial court regarding the proper justification instruction. During the discussion as to which justification instruction should be given, the trial court stated:

> What makes this case hard is it's a stick. It's a lot different from a knife or a gun. The stick is used over the back. It breaks. It's still in his hand from the one witness, Mr. Williams testified it's still in his hand. ***Is it capable of causing death or serious bodily injury if someone whacks you on the back of the head with a stick? Yes, they can easily kill you. Could Mr. Thompson [Poncho] in his particular condition have wielded in such a way to cause death? I don't know.*** But under this statute here that Mr. Gaines had no duty to retreat if all those factors are met. If Mr. Thompson – if that stick represented a deadly weapon and he thought – Mr. Gaines thought I can't get up and run and maybe I could get away. But maybe as he turned around he's getting hit on the back of the head, he doesn't have to retreat. He has a right to stand his ground and meet deadly force with deadly force. It's about the low end, ***but there is no question you strike someone in the head with a stick, you can kill them.***[179]

Mr. Gaines seizes the highlighted portions, arguing it is the trial court's opinion the stick used by Poncho to hit Mr. Gaines is, as a matter of law, a weapon readily or apparently capable of lethal use. There is no merit to this argument.

The passage excised by Mr. Gaines is taken out of context. At the charging conference, the trial court raised the appropriate justification, use of force, deadly force, and self-defense instruction.[180] The trial court recognized Attorney Sletvold mentioned the "castle doctrine" at the beginning of the trial and, upon the court's review, told counsel the court did not believe the "castle doctrine" applied. Under Pennsylvania law, "the castle doctrine is a specialized component of self-defense, which recognizes that a person has no duty to retreat from his or her home before using deadly force as a means of self-defense."[181] The trial court advised counsel it believed Pennsylvania Suggested Standard Jury Instruction 9.501 – "Use of Force/Deadly Force

in Self-Defense" applied rather than Suggested Standard Criminal Jury Instruction 9.501A -

"Justification: Use of Force/Deadly Force in Self-Defense (Castle Doctrine)."[182]

Attorney Sletvold urged the application of instruction 9.501A, the "castle doctrine,"

specifically the portion of the instruction providing for an exception to the duty to retreat.[183]

Under instruction 9.501A, a defendant has a duty to retreat where he knows he "could avoid the

necessity of using deadly force with complete safety by retreating."[184] But Pennsylvania law

recognizes an exception to the duty to retreat where:

> (iii) A defendant is not obligated to retreat from the place where he or she is attacked if:
>
> A. The defendant has a right to be in that place;
>
> B. The defendant is not at that time engaged in criminal activity. "Criminal activity" means conduct that is a misdemeanor or felony, is not justifiable under the Crimes Code, and is related to the confrontation between an actor and the person against whom force is used;
>
> C. The defendant is not at that time illegally in possession of a firearm;
>
> D. The defendant reasonably believes it is immediately necessary for him or her to protect himself or herself against death, [or] serious bodily injury [or kidnapping or sexual intercourse compelled by force or threat]; and
>
> E. ***The person against whom the defendant uses force displays or otherwise uses a firearm or any weapon readily or apparently capable of lethal use***.[185]

The Commonwealth argued this exception may apply if "someone is pointing a gun at

you," but the trial court emphasized this case is different because it does not involve a gun or a

knife and, instead, involved a stick. The trial court asked, "It is a stick, a weapon, that is readily

capable of lethal use. Can you kill somebody by hitting them on the head with a stick?"[186]

The trial court did not "opine" the stick is a lethal weapon as a matter of law. The trial

court instead found because the stick could be a lethal weapon, Mr. Gaines is entitled to the

instruction on the exception to the duty to retreat and left it to the jury to determine if, under the

evidence adduced at trial, the jury found the stick Poncho used against Mr. Gaines is a "weapon readily or apparently capable of lethal use." Attorney Sletvold argued, "The jury doesn't have to find that we have proven apparently capable. The Commonwealth has to prove beyond a reasonable doubt that that stick is not apparently capable [of lethal use]." The trial court responded, "That's correct. But everything about this ties into the justification defense. *If the jury believes that the defendant believed he was in such threat that he had to use this knife, . . . well then the belief he has a justification defense*."[187]

There is no support in the record to Mr. Gaines's argument the trial court "opined" the stick is a lethal weapon as a matter of law. There is also no authority, and Mr. Gaines cites none, allowing a trial court to determine a weapon is capable of lethal use as a matter of law. While counsel may be ineffective for failing to request jury instructions, "[c]ounsel will not be held ineffective for failing to request an instruction to which his client was not entitled."[188] Attorney Sletvold's performance did not fall below an objective standard of reasonableness. Mr. Gaines fails to meet the first prong of the *Strickland* test on this ineffective assistance of trial counsel claim.

We deny both of Mr. Gaines's pro se ineffective assistance of trial counsel claims. We turn next to Mr. Gaines's pro se claims of ineffective assistance of PCRA counsel.

### 3.   The remaining pro se claims of ineffectiveness of PCRA counsel are procedurally defaulted and not excused under *Martinez*.

Mr. Gaines also argues three grounds for habeas relief based on PCRA counsel's ineffectiveness. We conclude these grounds are procedurally defaulted and not excused by *Martinez*:

- failing to raise in the initial PCRA petition and/or on collateral appeal the ineffectiveness of trial counsel for failing to obtain the complete criminal record of material witness Mr.

44

Williams and/or the Commonwealth violated *Brady v. Maryland* by failing to disclose this evidence; [189]

- failing to raise in the initial PCRA petition or on the collateral appeal the ineffectiveness of trial counsel for failing to investigate and obtain Mr. Williams's criminal record precluding the ability at trial to (1) effectively impeach Mr. Williams, and (2) request a *crimen falsi* jury instruction;[190]

- failing to raise in the initial PCRA petition and/or on the collateral appeal ineffectiveness of trial counsel for failing to request a jury instruction on the voluntariness and constitutionality of Mr. Gaines's statement to the police.[191]

Mr. Gaines concedes these claims are procedurally defaulted but argues their default is excused by *Martinez*.[192] The Commonwealth does not address Mr. Gaines's *Martinez* argument.

The Supreme Court's reasoning in *Martinez* will excuse Mr. Gaines's procedurally defaulted ineffective assistance of PCRA counsel claims if he can show (1) his procedurally defaulted ineffective assistance of trial counsel claims have "some merit"; and, (2) his PCRA counsel, Attorney Deschler, is ineffective under *Strickland*.

On review of the record, the *Martinez* reasoning does not save Mr. Gaines's procedurally defaulted ineffective assistance of PCRA counsel claims because they do not have "some merit" and thus are not "substantial" under the first prong of *Martinez*. Mr. Gaines "must 'show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'"[193]

### *Criminal record of Mr. Williams and impeachment.*

Mr. Gaines contends ineffectiveness of his PCRA counsel for failing to raise ineffectiveness of his trial counsel's alleged failure to obtain and investigate Mr. Williams's criminal record, precluding counsel from impeaching Mr. Williams at trial and requesting a *crimen falsi* jury instruction. In the alternative, Mr. Gaines claims the Commonwealth violated

*Brady v. Maryland*[194] by failing to disclose Mr. Williams's criminal record. Mr. Gaines asks us to "liberally constr[ue]" his claim counsel "either had a duty to investigate and obtain evidence surrounding [Mr.] Williams's criminal record or the Commonwealth had a duty to disclose it during trial which they did not do."[195] Mr. Gaines further argues if the Commonwealth "did in fact disclose [Mr. Williams's criminal record] to the defense, then trial counsel had a duty to impeach Mr. Williams with his criminal record and the failure to do so, amounts to ineffective assistance."[196]

The undisputed state court record confirms we must reject these arguments. We address the *Brady* argument first. In a November 28, 2012 discovery request, Attorney Sletvold requested the District Attorney, among other things, to "[s]tate whether any intended Commonwealth witness has any arrest or conviction record whatsoever, whether Federal, State or Local and the location and nature of the offense." At a May 2, 2013 pretrial conference, the District Attorney represented to the court: "Background checks on our witnesses will be furnished to defense counsel before testimony. I believe that's the only thing outstanding . . . ."[197] On the first day of trial, May 6, 2013, the District Attorney represented to the court: "I just want to update this morning the Commonwealth did turn over the criminal histories of potential witnesses that we may call . . . ."[198]

The record demonstrates Attorney Sletvold requested, and the Commonwealth produced, criminal histories of potential witnesses including Mr. Williams. There is no merit to Mr. Gaines's argument Attorney Sletvold failed to request Mr. Williams's criminal record or the Commonwealth violated *Brady.* This argument fails to meet *Martinez's* "some merit" prong.

Turning to the alleged ineffectiveness in not impeaching Mr. Williams, Mr. Gaines alternatively argues if the Commonwealth produced Mr. Williams's criminal record, Attorney

Sletvold had a duty to impeach Mr. Williams with his history of *crimen falsi* offenses, and his failure to do so constitutes ineffective assistance.[199] There is no merit to this claim either. As the Pennsylvania Superior Court found on the PCRA appeal, Attorney Sletvold made the strategic decision to rely on Mr. Williams's testimony to support Mr. Gaines's claim of self-defense "and to avoid the risk of the prosecution discrediting [Mr. Gaines] on cross-examination if he testified."[200] Having made the strategic decision to present Mr. Gaines's self-defense theory through Mr. Williams' testimony rather than Mr. Gaines himself, we cannot find merit to the claim Attorney Sletvold should have impeached the very person on whom the self-defense theory relied.

### *Jury instruction on voluntariness of statement to Inspector Reagan.*

Mr. Gaines next argues Attorney Sletvold provided ineffective assistance by failing to request a jury instruction on the voluntariness and constitutionality of Mr. Gaines's statement to Inspector Reagan on July 4, 2012. At trial, Inspector Reagan testified: he interviewed Mr. Gaines at the Easton Police Department; he read to Mr. Gaines his constitutional rights under *Miranda*; and Mr. Gaines read and signed the *Miranda* waiver form, including the record of the interview.[201] Inspector Reagan testified he "let [Mr. Gaines] know his name came up in this investigation" and asked him "his side of the story."[202] Inspector Reagan testified Mr. Gaines denied involvement in Poncho's killing and denied stabbing Poncho in self-defense.[203]

The trial court charged the jury with Pennsylvania Standard Suggested Jury Instruction, Criminal, 3.15 – "Consciousness of Guilt, Conduct of Defendant as Showing": "There was also evidence tending to show the defendant made false and contradictory statements when questioned by the police. If you believe this evidence, you may consider it as tending to prove the defendant's consciousness of guilt. You are not required to do so. You should consider and

47

weigh this evidence along with all the other evidence in the case. As I indicated to you, you may not find the defendant guilty solely on the basis of consciousness of guilt."[204]

Mr. Gaines contends this instruction should **not** have been given because he did not testify at trial. He argues Attorney Sletvold should have requested a different instruction under Pennsylvania's Suggested Standard Jury Instruction, Criminal, 3.04D – "Confession or Admission: Voluntariness-Proof; *Miranda*."[205] Mr. Gaines now challenges the voluntariness of his July 4, 2012 statements to Inspector Reagan. Mr. Gaines contends because the Commonwealth played portions of the recorded interview with Inspector Reagan, and because Inspector Reagan testified at trial, he suggested the self-defense theory to Mr. Gaines as a "tactic,"[206] the voluntariness of Mr. Gaines's interview is at issue.

But Mr. Gaines never raised the knowing and voluntary waiver of his *Miranda* rights. To be entitled to the voluntariness jury instruction, the issue had to have been raised at trial. Mr. Gaines does not claim trial counsel's ineffectiveness for failing to challenge the voluntariness of his statement to Inspector Reagan under *Miranda*. He argues ineffectiveness for failing to request a jury instruction on an issue not in evidence. There is no evidence the statements made by Mr. Gaines to Inspector Reagan were involuntary or not knowing. The evidence in the record is Inspector Reagan's trial testimony swearing he read to Mr. Gaines his constitutional rights from the standard Easton Police Department rights form; Inspector Reagan explained the rights form to Mr. Gaines "making sure that he understood what he was being read and what he was going to sign and agree to if he did, in fact, agree to, which he did"; and Mr. Gaines signed the form.[207] We cannot find trial counsel ineffective for failing to request a jury instruction Mr. Gaines was not entitled to. There is no merit to this ineffective assistance claim under the first prong of *Martinez*.

48

**C.     Mr. Gaines's counseled petition raising ineffective assistance claims are procedurally defaulted and not excused by *Martinez* or actual innocence.**

Mr. Gaines's counseled supplemental memorandum raises two additional ineffective assistance of trial and PCRA counsel:

1.   Ineffective assistance of trial counsel for failing to object to "unconstitutional burden-shifting instructions" the jury could infer specific intent to kill and malice from use of a knife on the arm, buttocks, and leg of another human being ***and*** ineffective assistance of PCRA counsel for failing to raise this ineffectiveness of trial counsel claim;[208]

2.   Ineffective assistance of trial counsel for failing to object to the trial court's interference with the right to call a defense witness (Sergeant Hornbaker) in violation of the Sixth Amendment ***and*** ineffective assistance of PCRA counsel for failing to raise this ineffectiveness of trial counsel claim.[209]

The Commonwealth concedes Mr. Gaines raised the Sergeant Hornbaker issue on direct appeal but did not raise it as an ineffective assistance of trial counsel in a state court PCRA claim. The Commonwealth argues these grounds are not exhausted, are procedurally defaulted, and not excused by *Martinez*.

Attorney Sturm concedes these grounds were not raised in the state court and are procedurally defaulted, but argues the default is excused by *Martinez*. Attorney Sturm alternatively argues we may excuse the procedurally defaulted claims under the "fundamental miscarriage of justice" exception because Mr. Gaines is actually innocent of first-degree murder.

We conclude neither *Martinez* nor the "fundamental miscarriage of justice" exception saves these procedurally defaulted ineffective assistance of counsel grounds.

**1.     Claim of ineffective assistance of counsel for failing to object to "unconstitutional burden-shifting instruction" is not excused by *Martinez*.**

Mr. Gaines challenges the trial court's jury instructions on first-degree murder and third-degree murder, arguing these instructions improperly imposed burden-shifting in violation of his

constitutional due process right requiring the Commonwealth to prove each element of the offenses beyond a reasonable doubt.[210]

Review of the trial court's jury instruction on first-degree murder shows the instruction followed the Pennsylvania Suggested Standard Jury Instructions, *inter alia*:

> Now, the specific intent to kill, including the premeditation, needed for first-degree murder does not require planning or previous thought or any particular length of time. It can occur quickly. All that is necessary is that there be time enough so that the defendant can and does fully form an intent to kill and is conscious of that intention. When deciding whether the defendant had the specific intent to kill, you should consider all the evidence regarding his words and conduct and the attending circumstances that would show his state of mind. ***If you believe that the defendant intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant had the specific intent to kill***.[211]

Mr. Gaines objects to the highlighted portion of the charge, arguing it improperly shifts the burden. The instruction given by the trial court is taken from Pennsylvania Suggested Standard Jury Instruction, Criminal, 15.2502A.

The instruction on third-degree murder similarly followed the Pennsylvania Suggested Standard Jury Instruction, provides, among other things:

> For murder of the third degree [sic], if the perpetrator identifies actions which showed his or her wanton and willful disregard of an unjustified and extremely high risk that his or her conduct will result in death or serious bodily injury to another. In this form of malice, the Commonwealth need not prove that the perpetrator specifically intended to kill another. The Commonwealth must prove, however, that the perpetrator took action while consciously; that is, knowingly, disregard the most serious risk he or she was creating, and by his or her disregard of that risk the perpetrator demonstrated his or her extreme indifference to the value of human life. As I indicated to you before, the killing is without malice if the actor acts with lawful justification or circumstances that reduce the killing to voluntary manslaughter. When deciding whether the defendant acted with malice, you should consider all the evidence regarding his words, conduct, and the attending circumstances that will show his state of mind. ***If you believe that the defendant intentionally used a deadly weapon on a vital part of William Thompson's body, you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant acted with malice***.[212]

50

Like his objection to the instruction on first-degree murder, Mr. Gaines objects to the highlighted portion of the charge, arguing it improperly shifts the burden. The instruction given by the trial court is taken from Pennsylvania Suggested Standard Jury Instruction, Criminal, 15.2502C.

After the jury began its deliberations, it sent a note to the trial court saying simply: "first degree, third degree, voluntary [sic]."[213] The trial court told counsel he presumed the jury wanted to be reinstructed on those three offenses.[214] Counsel agreed and the jury returned to the courtroom where the trial court re-read the relevant instructions.[215] The jury sent a second note to the court asking, "Is great bodily harm a condition - - is great bodily harm a condition for murder one or does it have to be an express intent to kill?"[216] The trial court stated it believed the best way to answer the question is to explain the elements of first-degree murder and voluntary manslaughter.   After agreement by counsel, the trial court re-read the first-degree murder instruction.[217]

Mr. Gaines objects to the trial court re-reading the same instructions in response to the jury's questions. Mr. Gaines contends the jury instruction imposed an unconstitutional presumption by telling the jury it may infer specific intent to kill from use of a knife on the arm, buttocks and leg because "it is not logical, does not stand to reason, and it undermines the presumption of innocence."[218] Mr. Gaines argues "there is no logical relationship between the use of a knife on the leg and the essential elements of specific intent to kill including deliberation and premeditation," and "it is unconstitutional to instruct the jury to infer specific intent to murder from the use of a deadly weapon on a vital part of the body especially in a situation

where a reasonable person would not believe that stabbing a person in the leg with a pen knife would cause death."[219]

There is no merit to this argument. Mr. Gaines's counsel characterizes the evidence regarding a stab wound "to the leg" with a "pen knife" a "reasonable person would not believe . . . would cause death" contrary to the facts. As analyzed above, the undisputed evidence at trial is Dr. Land's testimony Poncho suffered five stab wounds, including in the groin area with such force as to perforate the femoral artery. Dr. Land testified a knife with a three-inch blade could penetrate several inches deeper if applied with sufficient force. Mr. Gaines's fact-based argument the evidence does not support the instruction, based on his counsel's version of the facts, is without merit.

To the extent Mr. Gaines argues the instruction imposes a presumption resulting in a burden-shifting to him, there is no merit to this argument. Counsel cites *Rock v. Zimmerman*[220] to support Mr. Gaines's argument the jury instructions here imposed an impermissible presumption on the burden of proof. *Rock*, to the extent it is not overruled, is distinguishable. There, defendant objected to a jury charge:

> [T]he intentional, unlawful, and fatal use of a deadly weapon against a vital part of the body ***gives rise to the presumption of fact that an intent to kill existed. This is a presumption of fact based on common knowledge that such use is almost certain to be fatal***. Every person is presumed to intend the natural and probabl[e] consequences of his act; but being ***a presumption of fact***, it may be rebutted by other circumstances in the case, and whether it is so rebutted is a question for you to decide. So what the law is on the subject is that if [defendant] intentionally, without justification, that means lawfully, did use a deadly weapon against a vital part of the body of the victim or victims, then that gives rise for you to consider that there is a presumption of fact that an intent to kill existed. Because we all know that such use is almost certain to be fatal.[221]

Our Court of Appeals found this instruction "relieved the State of a portion of its burden of proving each element beyond a reasonable doubt" because the state court instructed the jury

once the state "proved the intentional use of a deadly weapon against a vital body part, the law **presumed** deliberation and premeditation unless other evidence showed their absence."[222] Our Court of Appeals found defective the trial court's instruction "the existence of the predicate fact 'gives rise to the presumption' and that '[t]his is a presumption of fact'" and impermissibly explained the rationale for the presumption as "every person is presumed to intend the nature and probabl[e] consequences of his act."[223]

The trial court in Mr. Gaines's case did not instruct the jury on a presumption. The trial court, based on the standard Pennsylvania charge, instead instructed the jury **if** it believed "the defendant intentionally used a deadly weapon on a vital part of the victim's body, **you may** regard that as an item of circumstantial evidence **from which you may, if you choose, infer** that the defendant had the specific intent to kill."  There is no presumption here.

As we find no merit, *Martinez* does not save this procedurally defaulted claim.

> **2.      Claim of ineffective assistance of counsel for failing to object to trial court's alleged "interference" in the right to call Sergeant Hornbaker is not excused by *Martinez*.**

Mr. Gaines's counsel additionally argues ineffective assistance of counsel for failing to object to the trial court's alleged "interference" in the right to call Sergeant Hornbaker as a witness. As fully analyzed above, there is no merit to this claim. The Superior Court on direct appeal rejected this argument based on the trial court's factual findings Attorney Sletvold's offer of proof on Sergeant Hornbaker improperly intruded on the jury's role as fact finder.

The trial court offered *Commonwealth v. Light*, a Pennsylvania Supreme Court decision, supporting its decision to preclude Sergeant Hornbaker based on Attorney Sletvold's offer of proof.[224] In *Light*, the Pennsylvania Supreme Court recognized self-defense contains a subjective and objective element. Although expert testimony may be admissible on the subjective element,

"[i].e., the subjective element of the defendant's state of mind at the time of the occurrence," it "would be of no help in determining whether that belief was reasonable in light of all the circumstances" and is inadmissible.[225]

Attorney Sletvold's offer of proof on Sergeant Hornbaker's testimony related to the reasonableness of Mr. Gaines's actions with regard to the stick. The proffer would have Sergeant Hornbaker testify whether he would allow someone in the courtroom to be hit with a stick. Based on this proffer, the trial court excluded Sergeant Hornbaker, affirmed by the Superior Court on direct appeal. There is no merit to this claim, and we cannot find counsel ineffective for failing to raise a meritless claim.

As we find no merit, *Martinez* does not save this procedurally defaulted claim.

### 3. There is no new evidence to support a finding of "actual innocence" to excuse procedurally defaulted claims.

We may consider Mr. Gaines's habeas petition on the merits despite a procedural default if he can make a sufficient showing of actual innocence "unless the totality of equitable circumstances ultimately weigh heavily in the other direction."[226] The United States Supreme Court in *Schlup v. Delo* established the analytical framework to determine the "narrow class of cases . . . implicating a fundamental miscarriage of justice" because of actual innocence sufficient to excuse procedurally defaulted claims.[227] "The required showing is usually discussed as having two steps: first, the petitioner must present 'new reliable evidence" of actual innocence," meaning "factual innocence, not legal insufficiency."[228] Mr. Gaines must proffer "new" and "reliable" evidence relating to his claim.[229] The second step requires "evidence must 'persuade[ ] the district court that . . . no juror, acting reasonably, would have voted to find [the petitioner] guilty beyond a reasonable doubt.'"[230]

Attorney Sturm argues for both procedurally defaulted ineffective assistance of trial counsel and PCRA counsel to show Mr. Gaines is actually innocent of first-degree murder.[231] Attorney Sturm does not identify new and reliable evidence, instead arguing Mr. Gaines is actually innocent of murder because self-defense negates malice. The Supreme Court in *Schlup* explained the difference between a procedural and substantive claim of actual innocence.[232] Whereas here, Mr. Gaines's constitutional claim is based "not on his innocence, but rather on his contention that the ineffectiveness of his counsel . . . denied him the full panoply of protections afforded to criminal defendants by the Constitution," Mr. Gaines must overcome his concededly procedurally defaulted claims by falling within the "narrow class of cases . . . implicating a fundamental miscarriage of justice."[233] Mr. Gaines's claim of actual innocence "does not by itself provide a basis for relief" but "[i]nstead . . . depends critically on the validity of his *Strickland* . . . claims."[234] Under *Schlup*, Mr. Gaines's "claim of innocence is thus 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claims considered on the merits.'"[235]Applying *Schlup*'s test to Mr. Gaines's procedurally defaulted claims, he fails to proffer new and reliable evidence bringing him within the narrow class of cases implicating a fundamental miscarriage of justice.

### D.  Evidence adduced at trial is sufficient to support the jury's verdict.

Mr. Gaines challenges the sufficiency of the evidence to support a conviction of first-degree murder. We apply the standard provided by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[236] Congress instructs, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[237] "On federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"[238]

Mr. Gaines argues both the trial court's and Pennsylvania Superior Court's denial of his insufficiency of the evidence claim "were contrary to and/or were unreasonable applications of clearly established Federal law, as determined by the Supreme Court of the United States, or were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings."[239] Although he argues the Pennsylvania state courts' decisions were contrary to and/or were an unreasonable application of clearly established federal law by the United States Supreme Court, he does not brief the issue in either his pro se memorandum or counseled memorandum. We deny Mr. Gaines's petition to the extent it is based on section 2254(d)(1).[240]

We turn to Mr. Gaines's challenge to the sufficiency of the evidence supporting his state court conviction. "[T]he clearly established federal law governing the insufficient evidence claim is the standard set out by the Supreme Court in *Jackson v. Virginia* . . . Under *Jackson*, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, ***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[241] "This reasonable doubt standard of proof requires the finder of fact 'to reach a subjective state of *near certitude* of the guilt of the accused."[242] "A conviction that fails to satisfy the *Jackson* standard violates due process, . . . and thus a convicted habeas

petitioner is entitled to relief if the state court's adjudication denying the insufficient evidence claim was objectively unreasonable . . ."[243]

The Pennsylvania Superior Court's September 2, 2014 memorandum is the last reasoned Pennsylvania court decision adjudicating Mr. Gaines's insufficient evidence claim.[244]  The Superior Court first examined the Pennsylvania Crimes Code stating: "[a] criminal homicide constitutes murder of the first degree when it is committed by an intentional killing."[245] To sustain a conviction of first-degree murder under Pennsylvania law, "the Commonwealth must demonstrate that a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill, *i.e.*, the killing was performed in an intentional, deliberate, and premeditated manner. ***Specific intent may be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body*** . . . ."[246]

The Superior Court applied Pennsylvania's standard for the application of the defense of self-defense.[247] After review of the record, the Superior Court affirmed the trial court's decision, finding—on the sufficiency of the evidence challenge—the "Commonwealth presented sufficient evidence to convict [Mr. Gaines] of first-degree murder and to show that he did not act in self-defense where evidence showed [Mr. Gaines] was [the] 'initial aggressor by sucker punching [Poncho] and then continuously punching and kicking him until [Mr.] Williams was able to pull [Mr. Gaines] off' and [Mr. Gaines] repeatedly stabbed [Poncho] while [Poncho] was vulnerable and lying on ground."[248]

Mr. Gaines argues the evidence is insufficient to support a finding of specific intent to kill because the argument between he and Poncho began to escalate with both men becoming angry; the altercation turned physical but neither men used weapons; after the initial altercation,

Poncho walked away but returned with a stick and hit Mr. Gaines over the head causing both men to fall to the ground; in the second fight, Mr. Gaines pulled out a pocket knife in an effort to defend himself; and the stab wound to the femoral artery in the right groin area is "not an area where someone would stab someone with the intention to kill."[249] Mr. Gaines argues his case is "more akin to this classic third-degree murder fact pattern" and he had a right to defend himself, he had no specific intent to kill, and the state courts erred when finding the evidence sufficient to sustain a conviction of first-degree murder.[250]

Mr. Gaines's counsel supplements this argument by contending the fact one of the stab wounds "happened to nick an artery does not establish specific intent to kill or malice" because the stab wound to the right groin is "not directed at a vital part of the human body"; Mr. Gaines "had no reason to expect that stabbing [Poncho] in the leg would cause death"; the "knife was not directed at the femoral artery"; and Mr. Gaines simply defended himself combine to show the jury's finding of first-degree murder, requiring specific intent, is unreasonable.[251]

Mr. Gaines relies heavily on *Commonwealth v. Austin*.[252] In *Austin*, the Pennsylvania Superior Court affirmed a lower court's order granting defendant's motion to quash a first-degree murder charge.[253] The Commonwealth argued it provided *prima facie* evidence of defendant's specific intent to kill and malice based on defendant's use of a knife to fatally stab the victim. The preliminary hearing judge concluded defendant did not intend to direct the knife into the victim's body, finding defendant—in response to being hit by a pipe by the victim— swung a knife at the victim.[254] The Superior Court rejected the Commonwealth's argument defendant's "swinging" of the knife showed defendant's "focus was on plunging the knife into the victim, from which it can be inferred that [defendant] intended to kill the victim."[255] The

Superior Court disagreed, finding the evidence "supports the position that [defendant's] focus was on swinging the knife and not on stabbing the victim."[256]

The Superior Court identified the "proper focus for determining the mental component of the crime" is **not** "the physical act of using the knife on a vital area" but "how [defendant] intended to use the knife or what caused the knife to come into contact with a vital area of a human body. A specific intent to kill and malice are properly implied when a deadly weapon is directed to a vital part of the body. . . In other words, what did [the defendant] intend to do with the knife: was it his intention to put the knife into the victim or was it his intention to do something else."[257] The Superior Court found "the preliminary hearing judge had to determine from the evidence what [defendant's] intentions were up to and including the moment of the knife's contact with victim. There is no evidence that the knife was directed at a vital part of the victim's body. [The defendant] admitted to swinging the knife and the Commonwealth presented no other evidence concerning this issue. The judge found [the defendant] did not intend to direct the knife into victim's body. We agree."[258]

We face a much different set of facts. The evidence at trial showed Mr. Gaines, getting up off the ground after Poncho hit him with the stick, pulled out his knife, said something like, "Oh, it's like that? Yeah, it's like that," and stabbed Poncho five times while Poncho remained on the ground. Dr. Land's testimony established Mr. Gaines applied the fatal stab wound with enough force to go through the skin, soft tissue, and muscle, completely perforating the femoral artery, and going further into the muscle of the right thigh. Mr. Gaines continued to stab Poncho until Mr. Williams pulled Mr. Gaines away from Poncho. The trial court found, as affirmed by the Pennsylvania Superior Court, "[e]ven though there was no evidence that [Mr. Gaines] knew about the femoral artery and its vitality to the human body, the jury could find that [Mr. Gaines]

acted with the specific intent to kill Poncho when he stabbed him not once, but five times while Poncho was on the ground. [Mr. Gaines] had time to get off the ground, recover, pull out his knife, make a statement, and then attack Poncho while Poncho was on the ground. [Mr. Gaines] was also not stabbing Poncho to keep Poncho away from him, since Poncho was still on the ground with the broken stick in his hand when [Mr. Gaines] pulled out his knife."[259]

These facts are different from *Austin* where the evidence established defendant's focus on swinging the knife at the victim, not stabbing the victim. Here, the evidence showed Mr. Gaines on top of Poncho stabbing him five times until Mr. Williams pulled him off. Unlike *Austin*, there is sufficient evidence to find Mr. Gaines did not act to keep Poncho away from him in an act of self-defense.

Evidence adduced at trial supported the jury's finding Mr. Gaines did not act in self-defense. Mr. Williams testified: Mr. Gaines and Poncho argued outside the Ferry Street house; Mr. Gaines became the initial aggressor by punching Poncho "out of nowhere" with a "vicious" hit; Poncho fell to the ground where Mr. Gaines continued to hit and kick Poncho in the back of the head; Mr. Williams pulled Mr. Gaines from Poncho who got up and walked away; after Poncho returned with the stick to hit Mr. Gaines, the two fell to the ground where Mr. Gaines stabbed Poncho five times. The trial court found no evidence, and Mr. Gaines does not point to any in his habeas petition, to show he reasonably believed Poncho, while on the ground, posed an imminent danger of death or serious bodily injury necessary to use deadly force against Poncho.  Mr. Gaines did not testify; he did not claim self-defense when interviewed by Inspector Reagan; and, as reasoned by the trial court, Mr. Gaines "relied upon the observations of the other witnesses, particularly [Mr.] Williams, to support his assertion of self-defense and that he had a reasonable belief that deadly force was necessary."[260]

The trial court reasoned Mr. Gaines failed to present evidence Poncho, while still on the ground with part of the stick in his hand, "was in the position to use it at the time in a manner that would threaten [Mr. Gaines]. [Mr. Gaines] was not in a position where it was necessary to use deadly force against Poncho."[261] The trial court found the Commonwealth demonstrated Mr. Gaines violated the duty to retreat and demonstrated the stick, introduced at trial and viewed by the jury, is not a "weapon readily or apparently capable of lethal use."[262]

Viewing the evidence in the light most favorable to the Commonwealth, any rational factfinder could have found the essential elements of the crime of first-degree murder beyond a reasonable doubt under the *Jackson* standard.

### E.   We deny a certificate of appealability on the denied claims.

"[A] state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition."[263] Section 2253 provides the standard for a certificate of appealability required for appellate review of a district court's judgment denying habeas relief:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

   (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

   (B) the final order in a proceeding under section 2255.

 (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).[264]

A certificate of appealability "will issue only if the requirements of § 2253 have been satisfied."[265] A habeas petitioner seeking a certificate of appealability "need only demonstrate 'a substantial showing of the denial of a constitutional right.'"[266] A petitioner "satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[267]

Federal Rule of Appellate Procedure 22 contemplates a district court issuing a certificate of appealability in the first instance: "(b) Certificate of Appealability. (1) In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court, or in a 28 U.S.C. § 2255 proceeding, the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c). If an applicant files a notice of appeal, the district clerk must send to the court of appeals the certificate (if any) and the statement described in Rule 11(a) of the Rules Governing Proceedings Under 28 U.S.C. § 2254 or § 2255 (if any), along with the notice of appeal and the file of the district-court proceedings. If the district judge has denied the certificate, the applicant may request a circuit judge to issue it."[268]

Given the standard we apply today to habeas challenges to state trial court evidentiary rulings and ineffectiveness of counsel, we cannot find jurists of reason could disagree with our reasoning in denying the petition as to all claims except the ineffectiveness of trial and post-conviction counsel in failing to request the "no adverse inference" instruction.

**III.     Conclusion**

62

Mr. Gaines and his trial counsel chose to rely on a self-defense argument after the evidence confirmed the potential drug purchaser hit Mr. Gaines with a house rail after Mr. Gaines turned away thinking the scuffle ended. An eyewitness described the scuffle and Mr. Gaines's response to being hit with a house rail. The trial lawyer chose to rely on the witness testimony to show self-defense, justification, or a "stand your ground" defense and elected not to call Mr. Gaines as a witness, a decision Mr. Gaines confirmed he understood after colloquy with the trial court. The trial judge twice agreed to instruct the jury it could draw "no adverse inference" from Mr. Gaines's decision to not testify if requested. Although he requested the "no adverse inference" instruction and the trial court indicated it would give the instruction, Attorney Sletvold then decided to not ask for it after the trial judge omitted the instruction to avoid drawing attention to the issue which presumably could only aid Mr. Gaines. He made this decision without talking to Mr. Gaines. Counsel may choose not to seek the "no adverse inference" instruction under Pennsylvania law for strategic reasons but, given the trial judge told the Defendant he would give the charge if requested, and counsel twice told the trial judge he would seek the instruction, we find no possible basis for not requesting the instruction unless counsel made a strategic decision not to ask for the instruction after hearing the trial judge omitted it. At our evidentiary hearing, trial counsel testified after the trial judge failed to give the "no adverse inference" instruction, counsel made a strategic decision not to object to its omission because it may draw unnecessary attention to the request. But trial counsel instead asked for another instruction on reasonable doubt. Trial counsel failed to discuss the decision not to request the "no adverse inference" charge with Mr. Gaines and did not obtain his waiver of the "no adverse inference" instruction. The trial judge instructed on first- and third-degree murder

and voluntary and involuntary manslaughter. The jury deliberated without a "no adverse inference" instruction. The jury found Mr. Gaines guilty of first-degree murder. His trial counsel did not raise the failure to give the "no adverse inference" charge in post-trial motions or on direct appeal. Mr. Gaines's PCRA counsel also neglected to raise this potential ineffectiveness claim.

The Commonwealth adduced sufficient evidence to support a finding of guilt. But trial counsel's failure to ask Mr. Gaines's consent to withdrawing the demand for a "no adverse inference" instruction after Mr. Gaines twice elected not to testify at trial after being told the trial judge would instruct on the "no adverse inference" is constitutionally ineffective assistance of counsel. The trial counsel's present explanation of a strategic decision does not excuse his need to consult with Mr. Gaines who twice relied on the representation of a no "adverse inference" instruction. The present explanation also does not make sense given trial counsel asked for a reasonable doubt charge and we cannot discern why the jury would draw attention to the "no adverse inference" charge as part of a longer supplemental charge. His trial counsel failed to raise this issue on direct appeal and his post-conviction counsel failed to raise this issue.

After evaluating the credibility of testimony from trial and post-conviction counsel, we must find Mr. Gaines has been deprived of constitutionally effective assistance of counsel from the trial and direct appeal counsel as well as the post-conviction counsel solely because of the lack of a "no adverse inference" instruction. Mr. Gaines faced substantial prejudice after he twice relied on assurances of getting the instruction when he declined to testify and his counsel then decided not to ask for it after the close of the evidence when he could no longer testify without asking him. The trial judge charged the jury on the first-degree murder and including the homicide progression charges of third-degree murder, voluntary manslaughter, and involuntary

64

manslaughter. Mr. Gaines's testimony, or an instruction explaining "no adverse inference" could be drawn from not testifying, could readily affect the jury's verdict on these differing levels of homicide charges and resulted in a lower sentence. "A defendant's decision not to testify in his own defense is the proverbial 800-pound gorilla looming in the corner, and while this decision does not constitute affirmative evidence, neither does it escape the notice of many juries."[269]

Post-conviction counsel also failed to raise this issue without explanation and his ineffectiveness prejudiced Mr. Gaines's ability to timely raise this claim in the post conviction court.

We grant Mr. Gaines's petition for habeas corpus on the ineffectiveness claim relating to the no adverse instruction charge. We deny and dismiss the remaining claims. We deny a certificate of appealability on the dismissed claims.

---

[1] Unless noted, we take our facts from the trial court's October 25, 2013 Memorandum Opinion, ECF Doc. No. 24-1 at 6–31 (using the pagination assigned by the CM/ECF docketing system).

[2] Notes of Testimony ("N.T."), May 7, 2013 at 39.

[3] Mr. Gaines is also known by the name "L."

[4] N.T. May 7, 2013 at 46.

[5] *Id.* at 46–47.

[6] *Id.* at 47.

[7] *Id.*

[8] *Id.* at 47–48.

[9] *Id.* at 48.

[10] *Id.* at 52.

[11] *Id.* at 49–50.

[12] *Id.* at 50.

[13] *Id.* at 192–93.

[14] *Id.* at 198–99.

[15] *Id.* at 200–01.

[16] At the time of his appointment, Attorney Sletvold's experience included trying at least five homicide cases. N.T. March 15, 2021 evidentiary hearing at 20.  His earlier experiences did not involve a self-defense or castle doctrine defense. *Id.*

[17] 18 Pa. Cons. Stat. § 2502(a) (1972).

[18] *Id.* § 2502(d).

[19] *Commonwealth v. Brown*, 987 A.2d 699, 705 (Pa. 2009) (citations omitted).

[20] *Commonwealth v. Dunphy*, 20 A.3d 1215, 1219 (Pa. Super. Ct. 2011) (citations omitted). *See also Commonwealth v. Santos*, 876 A.2d 360, 363 (Pa. 2005) ("[T]o convict a defendant of the offense of third[ ]degree murder, the Commonwealth need only prove that the defendant killed another person with malice aforethought. This Court has long held that malice comprehends not only a particular ill-will, but ... [also a] wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.")).

[21] 18 Pa. Cons. Stat. § 2503(a) (1972).

[22] *Id.* § 2504(a).

[23] *Id.* § 1102(a)(1).

[24] *Id.* § 1102(d).

[25] *Id.* § 1103(1).

[26] *Id.* § 1104(2).

[27] N.T. May 8, 2013 at 44.

[28] *Id.* at 45–47.

[29] *Id.* at 46.

[30] *Id.* at 51–57.

[31] *Id.* at 52–55.

[32] *Id.* at 56–57.

[33] *Id.* at 57.

[34] *Id.* at 56–57.

[35] *Id.* at 63–63.

[36] *Id.* at 63.

[37] Under Pennsylvania law, "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa. Cons. Stat. § 505(a) (1972).  There are limitations on justifying necessity for use of force.

> [D]eadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if: (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

*Id.* § 505(b)(2). There is no duty to retreat and a person has "a right to stand his ground and use force, including deadly force":

> An actor who is not engaged in a criminal activity, who is not in illegal possession of a firearm and who is attacked in any place where the actor would have a duty to retreat under paragraph (2)(ii) has no duty to retreat and has the right to stand his ground and use force, including deadly force, if: (i) the actor has a right to be in the place where he was attacked; (ii) the actor believes it is immediately necessary to do so to protect himself against death, serious bodily injury, kidnapping or sexual intercourse by force or threat; and (iii) the person against whom the force is used displays or otherwise uses: (A) a firearm or replica of a firearm as defined in 42 Pa.C.S. § 9712 (relating to sentences for offenses

committed with firearms); *or (B) any other weapon readily or apparently capable of lethal use.*

*Id.* §505(b)(2.3) (emphasis added). Mr. Gaines's defense focused on the stick used by Poncho as a "weapon readily or apparently capable of lethal use" under subsection 505(b)(2.3)(iii)(B).

[38] N.T. May 8, 2013 at 14–15.

[39] *Id.* at 15–16.

[40] *Id.* at 16.
[41] *Id.* at 18.

[42] *Id.* at 18–19.

[43] *Id.* at 74–75.

[44] *Id.* at 75–76.

[45] *Id.* at 76.

[46] *Id.* at 77.

[47] *Id.* at 77–80.

[48] *Id.* at 81.

[49] *Id.* at 116–17.

[50] ECF Doc. No. 24-1 at 30 (using the pagination assigned by the CM/ECF docketing system).

[51] Pennsylvania's suggested "no adverse inference" instruction provides: "It is entirely up to the defendant in every criminal trial whether or not to testify. [He] [She] has an absolute right founded on the Constitution to remain silent. You must not draw any inference of guilt, or any other inference adverse to the defendant, from the fact that [he] [she] did not testify."  Pa. SSJI (Crim), § 3.10A (2019).

[52] N.T. May 8, 2013 at 20–21.

[53] *Id.* at 21.

[54] *Id.* at 78.

[55] *Id.* at 84–139.

[56] N.T. May 9, 2013 at 40–89.

[57] *Id.* at 91.

[58] *Id.* at 91–92.

[59] *Id.* at 93.

[60] *Id.* at 96–97.

[61] ECF Doc. No. 24-1 at 37 (using the pagination assigned by the CM/ECF docketing system).

[62] *Commonwealth v. Gaines*, No. 1938 EDA 2013, 2014 WL 10588519 (Pa. Super. Ct. Sept. 2, 2014).

[63] *Id.* at *8.

[64] *Id.* at *8–*9.

[65] *Commonwealth v. Gaines*, 718 MAL 2014, 109 A.3d 678 tbl. (Pa. 2017).

[66] *See* 42 Pa. Cons. Stat. §§ 9541–9546 (1982).

[67] ECF Doc. No. 24-2 at 1 (using the pagination assigned by the CM/ECF docketing system).

[68] Appointed counsel must file a "no-merit letter" under *Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988), and *Commonwealth v. Finley*, 550 A.2d 213 (Pa. Super. Ct. 1988) before counsel is permitted to withdraw from representing a petitioner in collateral proceedings.

[69] ECF Doc. No. 24-2 at 1–6 (using the pagination assigned by the CM/ECF docketing system).

[70] *Id.* at 7.

[71] *Commonwealth v. Gaines*, No. 3311 EDA 2015, 2016 WL 5419176, at *2 (Pa. Super. Ct. Sept. 27, 2016) (footnote omitted).

[72] *Id.* at *3.

[73] Approximately thirty percent of Attorney Deschler's practice is criminal defense. N.T. March 15, 2021 evidentiary hearing at 32. At the time of his appointment, Attorney Deschler had been in private practice for approximately three years. *Id.* at 39-40.

[74] ECF Doc. No. 24-3 at 1–23 (using the pagination assigned by the CM/ECF docketing system).

---

[75] *Id.* at 8.

[76] *Id.* at 55–65.

[77] ECF Doc. No. 24-3 at 73 (using the pagination assigned by the CM/ECF docketing system).

[78] *Commonwealth v. Gaines*, No. 115 EDA 2018, 2018 WL 4346381, at *6 (Pa. Super. Ct. Sept. 12, 2018).

[79] *Id.* at *3.
[80] *Id.*

[81] *Id.*

[82] *Id.* (citing *Commonwealth v. Smith*, 181 A.3d 1168, 1179 (Pa. Super. 2018).

[83] N.T. May 8, 2013 at 78–80; *Gaines*, 2018 WL 4346381 at *4.

[84] *Gaines*, 2018 WL 4346381, at *4.

[85] *Id.*

[86] *Id.* at *5.

[87] *Id.* at *6.

[88] *Commonwealth v. Gaines*, 204 A.3d 357 tbl. (Pa. 2019).

[89] ECF Doc. Nos. 1, 7.

[90] ECF Doc. No. 17.

[91] ECF Doc. No. 24.

[92] *Id.* at 14-15.

[93] *Id.* at 15-16.

[94] *Id.* When asked whether he withdrew the request for a "no adverse inference" instruction, Attorney Sletvold testified:

> [I] think I would have expected [the "no adverse inference" instruction] that it would have been given earlier in the instruction where the court instructs the jury on the burden of proof, the fact

that the defense does not have to present witnesses or evidence and I would have expected that the instructions specifically tailored to the defendant himself not testifying would have come at that portion. So, I would not have withdrawn it prior to the instructions. But as the instruction proceeded and went through the lengthy and somewhat convoluted instruction on self-defense, justification, essentially standing your ground, to tack that on at the end after the judge had concluded, I think would have or would have risked drawing undue attention to it. It was a decision that I made at the close of the jury instructions, not prior to the court beginning their instructions.

*Id.*

[95] *Id.* at 24-25.

[96] *Id.* at 18.

[97] *Id.* at 30.

[98] *Id.* at 35.

[99] ECF Doc. Nos. 44, 45, 46.

[100] ECF Doc. No. 7.

[101] ECF Doc. No. 17.

[102] *Id.* at 2.

[103] ECF Doc. No. 24 at 8.

[104] 28 U.S.C. § 2242 (2018).

[105] *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (citing Fed. R. Civ. P. 15(a)).

[106] 28 U.S.C. § 2254(b)(1)(A).

[107] *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

[108] *Rodland v. Superintendent of SCI Houtzdale*, No. 18-1892, 2020 WL 7385089, at *2 (3d Cir. Dec. 16, 2020) (citing *Lambert v. Blackwell*, 387 F.3d 210, 232–34 (3d Cir. 2004)).

[109] *Id.* (citing *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999)); *see also Nara v. Frank*, 488 F.3d 187, 197–98 (3d Cir. 2007) (citing *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam)) ("A petitioner has fairly presented his claim if he presented the same factual and legal basis for the claim to the state courts.").

[110] *O'Sullivan*, 526 U.S. at 848. *See Greene v. Superintendent Smithfield SCI*, 882 F.3d 443, 449 (3d Cir. 2018) ("[A] federal court may not review federal claims that were procedurally defaulted in state court . . . ." (alterations in original) (quoting *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017)).

[111] *Greene*, 882 F.3d at 449 (quoting *Davila*, 137 S. Ct. at 2064–65).

[112] *Id.* at 449 n.8 (second alteration in original) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013)).

[113] *Davila*, 137 S. Ct. at 2065 (internal quotation marks omitted) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

[114] *Id.* (quoting *Coleman v. Thompson,* 501 U.S. 722, 753 (1991)).

[115] *Murray*, 477 U.S. at 494 (alteration in original) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

[116] *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

[117] 566 U.S. 1 (2012).

[118] *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 937 (3d Cir. 2019) (quoting *Martinez*, 566 U.S. at 9).

[119] *Martinez*, 566 U.S. at 17.

[120] "[M]*artinez* applies if state law, 'either expressly or as a matter of practicality,' bars prisoners from raising IATC claims on direct appeal. . . . Pennsylvania state law requires prisoners to raise [ineffective assistance of trial counsel] claims on PCRA review, rather than on direct review." *Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 376 n.12 (3d Cir. 2018) (quoting *Cox v. Horn*, 757 F.3d 113, 124 n.8 (3d Cir. 2014)).

[121] *Id.* at 14.

[122] *Preston*, 902 F.3d at 376 (quoting *Cox*, 757 F.3d at 124).

[123] *Workman*, 915 F.3d at 937–38.

[124] *Id.* at 938 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)).

[125] *Id.*

---

[126] *Id.* (quoting *Martinez*, 566 U.S. at 17).

[127] 466 U.S. 668 (1984).

[128] *Blystone v. Horn*, 664 F.3d 397, 418 (3d Cir. 2011) (citing *Strickland*, 466 U.S. at 687).

[129] *Id.* (quoting *Strickland*, 466 U.S. at 694).

[130] *Id.* at 419 (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

[131] As analyzed above, the Commonwealth argues Mr. Gaines's pro se ineffective assistance of counsel claims "have been abandoned by virtue of the filing of a counseled petition that raises different issues than those raised in the original pro se petition." ECF Doc. No. 24 at 32. The Commonwealth argues even if we do not find Mr. Gaines's pro se grounds abandoned, his request for relief must be denied. As explained, we do not consider Mr. Gaines's pro se petition abandoned and will consider his pro se ineffective assistance of trial and PCRA counsel claims.

[132] ECF Doc. No. 7 at 18 (Ground Five).

[133] *Id.* at 23 (Ground Seven).

[134] ECF Doc. No. 7 at 9 (Ground Two).

[135] *Id.* at 13 (Ground Three).

[136] *Id.* at 16 (Ground Four).

[137] *Id.* at 21 (Ground Six).

[138] N.T. May 8, 2013 at 21, 78.

[139] N.T. May 15, 2021 evidentiary hearing at 15.

[140] *Preston*, 902 F.3d at 376 (citing *Strickland*, 466 U.S. at 688) (footnote omitted).

[141] *Preston*, 902 F.3d at 377 (quoting *Miller-El*, 537 U.S. at 336).

[142] *Id.*

[143] *Id.*

[144] *Id.* at 378.

[145] *Commonwealth v. Perez*, 103 A.3d 344, 348 (Pa. Super. Ct. 2014) (quoting *Commonwealth v. Lewis*, 598 A.2d 975, 979 (Pa. 1991)). In *Carter v. Kentucky*, the United States Supreme Court held a "state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify" through a no-adverse interest jury instruction. *Carter v. Kentucky,* 450 U.S. 288, 305 (1981).

[146] *Lewis v. Pinchack*, 348 F.3d 355, 359 (3d Cir. 2003).

[147] *Lewis*, 598 A.2d at 983, n.14.

[148] *Id.*

[149] *Id.* (internal quotation marks omitted) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

[150] *Howard v. Horn*, 56 F. Supp. 3d 709, 732 (E.D. Pa. 2014) (alteration in original) (internal quotation marks omitted) (quoting *Pagliaccetti v. Kerestes*, 948 F. Supp. 2d 452, 458 (E.D. Pa. 2013)).

[151] *Id.*

[152] ECF Doc. No. 45.

[153] ECF Doc. No. 46 at 6.

[154] *Preston*, 902 F.3d at 382 (quoting *Strickland*, 466 U.S. at 694).

[155] *Blystone*, 664 F.3d at 418 (quoting *Strickland*, 466 U.S. at 694).

[156] ECF Doc. No. 7 at 18.

[157] ECF Doc. No. 45 at 7–9.

[158] ECF Doc. No. 46 at 9.

[159] ECF Doc. No. 46 at 9–10. After the jury began its deliberations, it sent a note to the trial court saying simply: "first degree, third degree, voluntary [sic]." N.T. May 9, 2013 at 97. The trial court told counsel he presumed the jury wanted to be reinstructed on those three offenses. *Id.* at 97–98. Counsel agreed and the jury returned to the courtroom where the trial court re-read the relevant instructions. *Id.* at 98–106. The jury sent a second note to the court asking, "Is great bodily harm a condition - - is great bodily harm a condition for murder one or does it have to be an express intent to kill?" *Id.* at 107–08. The trial court stated it believed the best way to answer the question is to explain the elements of first-degree murder and voluntary manslaughter. After agreement by counsel, the trial court re-read the first-degree murder instruction. *Id.* at 107–13.

[160] *See Young v. Folino,* No. 08–2164, 2009 WL 5178302, at *21 (E.D. Pa. Dec. 23, 2009); *Howard*, 56 F. Supp. 3d at 735–37.

[161] *Commonwealth v. Thompson*, 674 A.2d 217, 221–22 (Pa. 1996). In *Thompson*, the jury convicted defendant Junior Thompson of first-degree murder, aggravated assault, possession of an instrument of crime, and two counts of criminal conspiracy in the shooting death of the victim. Mr. Thompson did not testify. His trial defense focused on the fact he did not shoot the gun used in the killing and disputed circumstantial evidence regarding the alleged conspiracy to commit murder. *Id.* at 221. After his conviction, Mr. Thompson appealed, asserting ineffective assistance of trial counsel for failing to include a "no adverse inference" jury instruction or obtain a waiver from him of the instruction. *Id.* On appeal, the Pennsylvania Supreme Court concluded Mr. Thompson failed to show prejudice by trial counsel's failure to request a "no adverse inference" instruction, reasoning "[g]iven the nature of the evidence presented at [Mr. Thompson's] trial the traditional concerns which prompt a request for, or a specific request to omit, the no adverse inference instruction are not present in this case." *Id.* The court explained, "[i]n contrast to the instant case, the situations which would prompt counsel to consider requesting or omitting a no adverse inference instruction normally arise where the testimony of the accused is vital to the nature of the defense asserted." *Id.* These "situations" include self-defense. Here, there were three people present at the fight between Mr. Gaines and Poncho: Mr. Gaines, Mr. Williams, and the deceased Poncho. Given Mr. Gaines's self-defense theory, his decision not to testify, and only Mr. Williams's eyewitness testimony, the concern regarding prejudice arising from the jury's perception of Mr. Gaines's failure to testify is heightened without the "no adverse inference" instruction.

[162] *Perez*, 103 A.3d at 351 (citing *Lewis*, 598 A.2d at 980).

[163] *Carter*, 450 U.S. at 301.

[164] ECF Doc. No. 7 (Grounds 5 and 7).

[165] *Strickland*, 466 U.S. at 700.

[166] ECF Doc. No. 24-3 at 8 (using the pagination assigned by the CM/ECF docketing system).

[167] *Id.* at 55–65 (using the pagination assigned by the CM/ECF docketing system).

[168] ECF Doc. No. 24-3 at 73 (using the pagination assigned by the CM/ECF docketing system).

[169] The Commonwealth concedes the ineffective assistance claim for failing to request a jury charge on the stick as a lethal weapon is exhausted and not procedurally defaulted. It instead argues the claim of ineffective assistance for failing to properly advise Mr. Gaines to testify at trial is not exhausted and procedurally defaulted. We disagree as Mr. Gaines raised this ground in the PRCA court and appeal to the Pennsylvania Superior Court.

[170] 28 U.S.C. § 2254(d) (2018).

[171] *Commonwealth v. Nieves*, 746 A.2d 1102, 1104 (Pa. 2000).

[172] ECF Doc. No. 7 at 20.

[173] N.T. March 8, 2017, PCRA hearing at 14.

[174] ECF Doc. No. 7 at 20.

[175] *Commonwealth v. Harris*, 884 A.2d 920, 925 (Pa. Super. Ct. 2005) (first citing *Commonwealth v. Jackson*, 585 A.2d 1001 (Pa. 1991); then citing *Commonwealth v. Gordon*, 512 A.2d 1191 (Pa. Super. Ct. 1986)).

[176] N.T. March 8, 2017, PCRA hearing at 41–42. Under Pennsylvania law, "a witness may be impeached by showing a prior conviction if the crime involved dishonesty or false statement." *Commonwealth v. LaMassa*, 532 A.2d 450, 452 (Pa. Super. Ct. 1987) (theft a *crimen falsi*); *see also Commonwealth v. Howard*, 823 A.2d 911, 913, n.2 (Pa. Super. Ct. 2003) (retail theft a *crimen falsi*); *Commonwealth v. Vickers*, 394 A.2d 1022, 1026–27 (Pa. Super. Ct. 1978) (unsworn falsification a *crimen falsi*); *United States v. Isaac*, No. 05-cr-576-1, 2007 WL 2684853, at *5 (E.D. Pa. Sept. 10, 2007) (a false identification is a false statement and may be used to impeach).

[177] ECF Doc. No. 7 at 21.

[178] *Id.* at 24.

[179] N.T. May 8, 2013 at 124–25 (emphasis added).

[180] *Id.* at 108.

[181] *Commonwealth. v. Childs*, 142 A.3d 823, 825 n.1 (Pa. 2016).

[182] N.T. May 8, 2013 at 108.

[183] *Id.* at 114–15.

[184] Pa. SSJI (Crim), § 9.501A(c) (2019).

[185] Pa. SSJI § 9.501A(c)(iii) (alterations in original) (emphasis added). The trial court read this instruction to the jury. N.T. May 9, 2013 at 63.

[186] N.T. May 8, 2013 at 116.

---

[187] *Id.* at 126–27.

[188] *Commonwealth v. Spotz*, 18 A.3d 244, 299–300 (Pa. 2011).

[189] ECF Doc. No. 7 at 9 (Ground Two).

[190] *Id.* at 13 (Ground Three).

[191] *Id.* at 21 (Ground Six).

[192] *Id.* at 9.

[193] *Workman*, 915 F.3d at 938 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)).

[194] 373 U.S. 83 (1963). Under *Brady*, the United States in a criminal prosecution "must disclose evidence that is (1) material to either guilt or punishment and (2) favorable to the accused." *United States v. Bansal*, 663 F.3d 634, 670 (3d Cir. 2011) (citing *United States v. Bagley*, 473 U.S. 667, 674 (1985)). "A *Brady* violation occurs if the government does not turn over such evidence and its failure to do so causes prejudice to the defendant." *Id.* (citing *Strickler v. Greene*, 527 U.S. 263, 281–282 (1999)).

[195] ECF Doc. No. 7 at 12.

[196] *Id.* at 12–13.

[197] N.T. May 2, 2013 at 5–6.

[198] N.T. May 6, 2013 at 7.

[199] Mr. Gaines attaches to his memorandum Mr. Williams's purported rap sheet. It shows Mr. Williams charged with possession of drug paraphernalia, possession of cocaine, burglary, assault, trespassing, and brandishing a firearm. ECF Doc. No. 7 at 48–52. Of these offenses, burglary is considered a *crimen falsi*. *See Harris*, 884 A.2d at 925 (burglary is a *crimen falsi* admissible for impeachment purposes).

[200] *Gaines*, 2018 WL 4346381, at *4.

[201] N.T. May 7, 2013 at 189–91.

[202] *Id.* at 191–92.

[203] *Id.* at 192–99.

[204] N.T. May 9, 2013 at 57.

[205] Pennsylvania Suggested Standard Jury Instruction, Criminal, 3.04D provides:

> 1. In determining voluntariness, you should also consider whether there was any violation of the requirements of the U.S. Supreme Court case of *Miranda v. Arizona*. *Miranda* requires that the police, before questioning a suspect in custody, give him or her the *Miranda* warning. The essence of the warning is that a suspect has the right to remain silent, that anything he or she says can be used against him or her, and that he or she has the right to the advice and presence of his or her own or a free attorney. The police are not to question a suspect unless he or she understands the warning and knowingly, intelligently, freely, and voluntarily gives up his or her rights to silence and an attorney.

> 2. Whether or not there was a violation of the *Miranda* requirements may be an important factor for you in determining whether a standard meets the basic test of voluntariness. The importance of any *Miranda* violation depends upon the nature, the seriousness, and reasons for the violation and whether it affected the defendant at the time [he] [she] made a statement.

Pa. SSJI (Crim), § 3.04D (2019) (alterations in original).

[206] Inspector Reagan testified:

> Q. Now, at any point during this interview, did you make any suggestions about the possibility of self-defense?

> A. Yes, I did.

> Q. Can you describe why you went down that road? Is that your belief? Is that your thought?

> A. At that point in the interview, no, it wasn't my thought. But because he was going to great lengths to distance himself from what the witness information we had, the evidence we had at that point, I didn't expect him to come in and say that. So once I was realizing he wasn't going to say he was there, obviously, that was a significant contradiction of information we had. So either everyone else was lying or he was lying. So it's a tactic to get someone to put themselves there in a case like this to say well, maybe it was self-defense; otherwise, how was all this evidence and why the witnesses saying you were there.

> Q. So this was part of investigative or interview tactic; correct?

> A. Correct.

78

N.T. May 7, 2013 at 192–93.

[207] *Id.* at 189–91.

[208] ECF Doc. No. 17 at 11–12, 15.

[209] *Id.* at 15–20.

[210] *Id.* at 12.

[211] N.T. May 9, 2013 at 70–71.

[212] *Id.* at 72–73.

[213] *Id.* at 97. Mr. Gaines's counseled memorandum contends "when the jury was unable to reach a verdict" on two occasions, the trial court re-read the allegedly offensive jury instruction. We note the record is clear the jury had two questions; there is no indication in the record the jury was unable to reach a verdict.

[214] *Id.* at 97–98.

[215] *Id.* at 98–106.

[216] *Id.* at 107–08.

[217] *Id.* at 107–13.

[218] *Id.*

[219] *Id.* at 12–13.

[220] 959 F.2d 1237 (3d Cir. 1992), *implied overruling recognized by Kontakis v. Beyer*, 19 F.3d 110, 116, n.9 (3d Cir. 1994).

[221] *Id.* at 1247 (second alteration in original) (emphasis added).

[222] *Id.* (emphasis added).

[223] *Id.* (alterations in original) (first internal quotation marks omitted).

[224] 326 A.2d 288 (Pa. 1975).

[225] *Id.* at 292.

---

[226] *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 59 (3d Cir. 2020) (internal quotation marks omitted) (quoting *Satterfield v. Dist. Attorney Phila.*, 872 F.3d 152, 163 (3d Cir. 2017)).

[227] *Schlup v. Delo*, 513 U.S. 298, 315 (1995) (alteration in original) (internal quotation marks omitted) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).

[228] *Howell*, 978 F.3d at 59, n.9 (first quoting *Schlup,* 513 U.S. at 324; then quoting *Reeves v. Fayette SCI*, 897 F.3d 154, 160 (3d Cir. 2018)).

[229] *Id.* (citing *Schlup*, 513 U.S. at 324).

[230] *Id.* (alterations in original) (quoting *Satterfield*, 872 F.3d at 163).

[231] ECF Doc. No. 17 at 5, 15, 19–20; ECF Doc. No. 29 at 12, 24.

[232] *Schlup*, 513 U.S. at 313–14.

[233] *Id.* at 314–15 (second alteration in original) (citations omitted) (second internal quotation marks omitted) (quoting *McCleskey*, 499 U.S. at 494).

[234] *Id.* at 315.

[235] *Id.* (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

[236] *See* 28 U.S.C. §§ 2241–2254 (2018). There is no dispute Mr. Gaines satisfied the exhaustion requirements for habeas petitions under 28 U.S.C. § 2254 on his claim of insufficient evidence through his direct appeal in the Pennsylvania courts.

[237] 28 U.S.C. § 2254(d).

[238] *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

[239] ECF Doc. No. 7 ¶ 32.

[240] Even if Mr. Gaines or his counsel briefed a claim the Pennsylvania Superior Court's decision is contrary to and/or an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, we would deny it. As analyzed, the Pennsylvania Superior Court properly applied Pennsylvania's standard of review on an insufficiency of the evidence claim equivalent to the United States Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Gaines*, 2014 WL 10588519, at *6–*7.

[241] *Travillion v. Superintendent Rockview SCI*, 982 F.3d 896, 902 (3d Cir. 2020) (citation omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[242] *Id.* (quoting *Jackson*, 443 U.S. at 315).

[243] *Id.* (citations omitted) (first citing *Jackson,* 443 U.S. at 319; then citing *Parker v. Matthews*, 567 U.S. 37, 43 (2012)).

[244] *See Gaines*, 2014 WL 10588519.

[245] *Id.* at *7 (quoting 18 Pa. Cons. St. § 2502(a) (1972)).

[246] *Id.* (alteration in original) (quoting *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011)).

[247] *Id.* at * 7–*8 (citing *Commonwealth v. Mouzon*, 53 A.3d 738, 740–41 (Pa. 2012)).

[248] *Id.* at *8 (quoting trial court's opinion at 12–21).

[249] ECF Doc. No. 7 at 7.

[250] *Id.* at 8.

[251] ECF Doc. No. 17 at 7–9. In a reply brief, Mr. Gaines's counsel for the first time disputes the location of the stab wound perforating the femoral artery as testified to by the Commonwealth's expert, Dr. Land. *See* ECF Doc. No. 29. Counsel asserts Dr. Land's expert testimony shows Poncho's stab wound occurred "in the leg and not in the groin" and the prosecution, the trial court, and the Pennsylvania Superior Court are all mistaken in finding the fatal stab wound to the groin. Counsel argues the prosecution's factual statement in its brief "is not accurate." Counsel makes conclusory assertions, with no evidence, "if the wound severed the femoral artery, then the victim was not stabbed in the groin"; "[p]lainly, if the stab wound severed the femoral artery, then the victim was not stabbed in the groin"; "the femoral artery does not supply blood to the groin"; Dr. Land did not testify Poncho "was stabbed in the groin"; and "if [Dr. Land] so testified it would have demonstrated his incompetence since the femoral artery is not located in the area of the groin." ECF Doc. No. 29 at 3–5.

This is not the evidence of record. First, Mr. Gaines's trial counsel stipulated Dr. Land is an expert in forensic pathology. Second, trial counsel did not cross-examine Dr. Land on the location of the stab wound perforating the femoral artery–the leg versus groin distinction. Third, trial counsel argued in closing Mr. Gaines stabbed Poncho "[i]n the groin area, the femoral artery was nicked and the victim bled out. That is what happened." N.T. May 6, 2013 at 18. And, finally, Dr. Land testified, with no evidence offered to contradict him:

- the fifth and fatal stab wound "***is to the right groin area***. It went in—the actual wound couldn't be described because the surgeons had cut into it trying to save his life. The wound went through the soft tissue, through the skin, through the soft tissue, and the

muscle of the right thigh. ***It also went through the femoral artery, which is the main artery that feeds the leg.*** It went—there was a complete perforation, front and back, of the femoral artery. The implement went further into the muscle of the right thigh. This caused massive bleeding, exsanguination, bleeding out, both externally and into the soft tissues of the thigh and into the back, into the pelvis, and into the back." N.T. May 8, 2013 at 56–57 (emphasis added).

- The femoral artery is a vital part of the human body or vital organ and explained the anatomy of the femoral artery including, "Here's the heart. It pumps blood into the aorta. The aorta splits in the lower iliac, into the iliac vessel. ***And then once it gets about the level of the genitalia, it splits into the femoral and some smaller vessels***. In the case of [Poncho], the stab wound was in this area [referring to a visual exhibit, Commonwealth 100, admitted with no objection], it says here calls it iliac, I call it femoral. It's all one system. I thought it was more femoral than iliac, but that's an arbitrary decision." *Id.* at 58–59 (emphasis added).

There is no support in the record for counsel's newly minted reply theory the fatal stab wound occurred in the leg, and not the groin area, to support an argument Mr. Gaines did not direct his knife at a vital part of Poncho's body.

[252] 575 A.2d 141 (Pa. Super. Ct. 1990).

[253] *Id.* at 142.

[254] *Id.* at 145.

[255] *Id.* at 144.

[256] *Id.*

[257] *Id.* (citations omitted).

[258] *Id.* at 144–45.

[259] ECF Doc. No. 24-1 at 18–19 (using the pagination assigned by the CM/ECF docketing system).

[260] *Id.* at 23.

[261] *Id.* at 23–24.

[262] *Id.* at 24–26.

[263] *Miller-El v. Cockrell*, 537 U.S. 322, 335–37 (2003) (citing 28 U.S.C. § 2253).

[264] 28 U.S.C. § 2253.

[265] *Miller-El*, 537 U.S. at 336.

[266] *Id.* at 327 (citing 28 U.S.C. § 2253(c)(2)).

[267] *Id.* at 323 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

[268] Fed. R. App. P. 22(b)(1).

[269] *Commonwealth v. Hawkins*, 894 A.2d 716, 729 (Pa. 2006).